[No. B062835. Second Dist., Div. Two. Jan. 20, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
ASHTEEN HILL, Defendant and Appellant.

**COUNSEL**

Elizabeth Brancart, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Marc E. Turchin and Lisa J. Schutzbank-Brault, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LORD, J.\***—Appellant was charged with one count each of murder and robbery, in violation of Penal Code sections[1] 187, subdivision (a) and 211. Both counts were alleged to be serious felonies. Both counts had a special allegation that appellant was armed with a firearm within the meaning of section 12022, subdivision (a)(1). After a jury trial, appellant was found guilty of first degree murder and second degree robbery, as charged in the information, and the jury found the special allegations to be true. Appellant was sentenced to 25 years to life on count one, plus 1 year pursuant to section 12022. The court imposed but stayed sentence on count two.

### STATEMENT OF FACTS

In the prosecution's case-in-chief, witnesses testified that the victim had just gotten off work at 2:30 p.m. from McDonnell Douglas Aircraft along with many coworkers. Upon arriving at his car in the employee parking lot, he was confronted by appellant and a juvenile accomplice named Daryl. A witness named Mr. Ausby testified that he saw a short man (Daryl) point a gun to the victim's head and then he heard a shot. The witness was not aware of appellant's presence at this point. After the first shot, the victim started to rub his head. Daryl then shot him a second time. The second shot apparently hit the victim in the neck. The victim started to run in witness Ausby's direction and then veered off towards a guardhouse. At this point in time, the witness saw appellant as he (appellant) and Daryl chased after the victim. As they were chasing the victim, the witness saw that appellant was carrying the victim's lunch pail. During this chase Daryl fired a third shot at the victim. The victim fell to the ground upon reaching the guardhouse and died as a result of the gunshot wound to his neck.

A second prosecution witness named Mr. Griffin testified that he saw appellant hitting the victim in the face and head. He then saw Daryl shoot the victim. Appellant then grabbed the victim's lunch pail away from him and Daryl shot him again. This witness testified that when the victim started to run away that appellant and Daryl ran in the opposite direction.

There was other testimony and evidence relating to the fact that as appellant and Daryl were trying to leave the scene in the vehicle they came in, that Daryl fired a shot at Mr. Griffin which shattered his windshield, and that the victim's lunch pail was discarded as the suspect vehicle was leaving the parking lot.

---

\*Judge of the Municipal Court for the Downey Judicial District sitting under assignment by the Chairperson of the Judicial Council.

[1]References to sections refer to Penal Code sections unless otherwise noted.

After the prosecution rested, appellant testified on his own behalf. He said he was the boyfriend of Daryl's sister, Kesha, at the time of the crime. Kesha drove over to appellant's house on the day of the crime with Daryl. Kesha told appellant that they were on their way to pick up some money from their uncle at McDonnell Douglas, and appellant was invited to accompany them. After arriving at the scene of the crime, Daryl exited the vehicle alone. Appellant said that he didn't pay any attention to where Daryl went. Kesha then told appellant that Daryl was fighting. Appellant saw Daryl about 40 feet to the rear of their vehicle, in a pushing match with an older man. Appellant said he exited the vehicle and walked over to them at a fast pace. When he got to about five feet from them, Daryl pulled out a gun and shot the man. Appellant had not touched the victim nor had he tried to separate the parties. As soon as Daryl fired the first shot, appellant ran back to Kesha's car and got back in. He told Kesha to drive off.[2] He heard two more shots fired. A few seconds later, Daryl got into the car. Daryl had the gun and a black lunch box. Appellant testified that he wanted to leave the scene because he didn't have anything to do with the shooting, he wanted no part in it and he had no reason to stay there.

In rebuttal, the prosecution called Daryl, who was age 14 at the time of the murder, but had turned age 15 by the time of this trial. Daryl testified that he did not recognize appellant and had not, to his knowledge, ever met him. Although he had been convicted of the murder in this case, he did not recall the incident, did not remember if he was the person who shot the victim, and did not remember making a statement to the police that he and a person named Wine-O robbed the victim because they had been led to believe that the victim always carried a substantial amount of cash. Daryl's memory loss was so complete that upon being asked if he remembered that the prosecutor and Detective Luper just spoke to him the day before his testimony, Daryl said, "I don't remember, because you know I've been thinking and thinking, and I forgot." The court's finding that Daryl's memory loss was deliberate is, understandably, not being challenged, nor is there a challenge to the court's resulting decision to allow evidence of Daryl's taped interview with the police which took place five days after the murder. In his previous statement to the police Daryl said that he was only the lookout in the preplanned robbery and that a man called Wine-O had the gun, did the shooting, and stole the lunch pail. It was also Wine-O who opened the lunch

---

[2]Respondent points out that this fact is subject to some debate. During direct examination appellant was asked: "Q. Did you tell Kesha to drive off? A. Yes." During cross-examination, however, appellant, in answer to several questions, said that he did not say anything to Kesha. However, although appellant's answers clearly appeared to contradict his earlier testimony, the focus of the questions on cross-examination related to the time frame before Daryl reentered the car. For the purpose of this decision we will assume appellant did tell Kesha to drive off.

pail and discovered that it only contained the remnants of lunch rather than the rumored fortune. Wine-O then threw the lunch pail out of the car window.

### *Issues on Appeal*

Appellant contends that (1) the court should have given the defense-requested instructions on section 32 because it was a lesser related offense; (2) the court failed to instruct the jury sua sponte regarding the testimony of an accomplice; (3) the court erred by giving the jury CALJIC No. 2.21.2 regarding a witness who is willfully false; (4) the cumulative effect of these errors requires reversal; and (5) the abstract of judgment must be corrected to properly record the sentenced imposed.

### I

Section 32, commonly referred to as accessory to a felony, provides: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." Appellant does not question the fact that section 32 is not a lesser included offense but argues instead that it is a lesser related offense. Appellant contends that (1) there is an evidentiary basis for the instruction because appellant testified that he told Kesha to drive the car away from the scene of the crime; (2) accessory to a felony is closely related to the offense of an aider or abettor or principal to the felonies charged; and (3) appellant's culpability as an accessory to a felony is consistent with his defense at trial. Therefore, appellant concludes, the three-pronged test set out in *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] was met and the court should have given the requested instruction.

In *Geiger* the court held that it was error not to give requested instructions to a jury regarding lesser related offenses. The court set out a three-part test to determine if lesser related offense instructions must be given. That test requires that (1) "some basis" exists for finding the offense to be less than that charged; (2) that the uncharged offense be "closely related" to the offense charged and shown by the evidence; and (3) that the defendant has relied on a defense at trial which is "consistent" with a conviction for the uncharged offense. (*Id.* at p. 531.) In order to prevent a defendant from being convicted on a charge to which there is no notice, the

court expressly provided that instructions on related offenses are only to be given at the request of the defendant. Later decisions have expanded this rule somewhat by providing that a defense failure to object to a trial court's proposed instruction on lesser related offenses constitutes implied consent and a waiver of any objection based on lack of notice. (*People* v. *Toro* (1989) 47 Cal.3d 966, 977-978 [254 Cal.Rptr. 811, 766 P.2d 577].)

Appellant's extensive and well-stated brief draws its principal strength from the language of *Geiger* which at first glance seems to allow for an almost limitless application. The dissent in *Geiger* expressed concern that the three-part test set guidelines that ". . . are too imprecise and broad to be of much value . . . ." (*People* v. *Geiger, supra*, 35 Cal.3d at p. 533 (dis. opn. of Richardson, J.) Even the majority in *Geiger* recognized "the possibility that experience will teach that these criteria are over—or underinclusive." (Id. at p. 532, fn. 12.). Experience has taught that, at a minimum, trial court interpretations of the *Geiger* test have been overinclusive.

We, therefore, will attempt to clarify the criteria necessary to a finding that an offense is a lesser related offense.

(1) Some basis must exist on which the jury could find the offense to be less than that charged. First, we note that, as with any other such term in law, there exists, axiomatically, the qualification of reasonableness. Second, although the term "some basis," even when qualified by the term reasonable, would not seem to present much of a limitation, careful analysis demonstrates that it does provide a significant limitation. The court's discussion of this initial prerequisite which must be found to exist in order to require instructions on related offenses is as follows:

"We recognize the possibility that a jury may choose to believe or disbelieve any or all of the People's evidence, and a defendant's right to instructions does not turn on the court's assessment of the strength of the evidence, or on whether there is a conflict in, rebuttal to, or impeachment of the People's evidence. (Citation omitted.) Nevertheless, where there is no evidence that the offense is less than or other than that charged and instructions need not be given on lesser included offenses, they need not be given on lesser related offenses. If the jury disbelieves the People's evidence in these cases, there is no incentive to convict and no conflict with the right to a reliable factfinding process. Therefore, the first prerequisite to receiving instructions on lesser related offenses must be the existence of some basis, other than an unexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged." (*Geiger, supra*, 35 Cal.3d at p. 531.) An actual finding by the jury that the *offense is less* than

that charged must be based on the evidence and it would necessarily require two mutually dependent conclusions; first, that the burden of proof has not been met to prove the charged offense, and second, that the burden of proof has been met to prove a lesser offense. The basis referred to in *Geiger* must serve this dual purpose of providing a basis on which the jury could find that the charged offense *has not* been adequately proved, and also, the basis must serve to support a finding that some lesser or other offense *has* been adequately proved. Therefore, the first prerequisite to receiving instructions on lesser related offenses must be the existence of some reasonable basis on which the jury could find that the burden of proof as to the offense charged has not been met, but the burden of proof as to some other lesser offense has been met.

(2) The offense must be closely related to the offense charged and shown by the evidence. The *Geiger* court mentions and impliedly rejects an "inherent relationship" test to limit the potential abuse by defendants "requesting instructions on every offense that is arguably shown by the evidence." (35 Cal.3d at p. 531.) The court does not offer any specific guidance as to the meaning of the term "closely related" but instead, simply concludes that the purpose of the rule serves to define its limits. As such, careful attention must be paid to the court's explanation of the purpose of the rule. The court stated:

"The right to instructions on related offenses exists only to enable the jury to determine fairly the issues presented by the evidence and in so doing to avoid any incentive to convict the defendant of a greater offense than that which he committed. The issues presented by the evidence are those related first to the defendant's guilt or innocence of the charged offense. Although some evidence offered by the People or the defendant may indicate that the defendant has committed a crime other than that charged, instructions regarding that crime need not be given unless the evidence is also relevant to and admitted for the purpose of establishing whether the defendant is guilty of the charged offense." (35 Cal.3d at p. 531.)

██ Guilt is established by presenting evidence to prove two things; first, the elements of the offense (the corpus delicti or body of the crime), and, second, the identity of the perpetrator. ██ Although the court's statement, "[t]he issues presented by the evidence are those related first to the defendant's guilt or innocence of the charged offense," could be read to include the issue of identity, this is clearly not appropriate in a lesser related offense discussion. The issues presented by the evidence, in keeping with the purpose of the rule on lesser offenses, relate to the elements of the offense charged. This may seem too elemental to require stating, and indeed, even the use note for the instruction on lesser included and related offenses in

CALJIC No. 17.10, fifth edition 1988, states: "The obligation to instruct on lesser included offenses arises whenever the evidence raises a question as to whether all of the elements of the charged crime are present . . . ." Lesser included or related offenses have no connection with the issue of identity. Obviously, if a jury has a doubt as to the identity of the defendant as the perpetrator, it may not, nevertheless, convict him or her of any lesser included or related offense. However, if the jury has no doubt as to identity but does have a doubt as to whether the offense committed fully encompasses offense charged, it "may nevertheless convict [him] [her] of any lesser crime" (CALJIC No. 17.10 (5th ed. 1992 pocket pt.) The *Geiger* court clearly recognized the lack of a connection between lesser related offenses and issues of identity by the language utilized in its description of the first prong of its test when it focused its discussion of the existence of "some basis" solely and exclusively to a finding that "the offense" is less than, or other than, the offense charged, as well as by the following express declaration contained in their description of the third prong of the test: ". . . the instruction need not be given . . . when the defense is alibi, or the only issue is identity. . . ." (*People* v. *Geiger, supra,* 35 Cal.3d, at pp. 531-532.) It should also be noted that, although the prosecution may introduce evidence of other crimes for the limited purpose of proving the identity of the perpetrator in a case, the prosecutor could not thereby seek a conviction for such other crime. It should be safe to say, on the other hand, that the defense would never introduce evidence of other crimes to prove the identity of the defendant as the actual perpetrator in the present case. It may be possible that the defense would introduce evidence of other crimes to disprove identity (e.g., the defendant could not have committed the charged crime because he or she was busy elsewhere committing some lesser crime), but this would only arise in a defense based on alibi, which as noted above, is specifically outside the realm of lesser related offense instructions. Therefore, consistent with the second prong of the *Geiger* test, instructions regarding related offenses need not be given unless the evidence of these offenses was relevant to and admitted for the purpose of proving or disproving an element of the charged offense. Evidence of other offenses, if introduced solely to prove identity, or evidence which merely describes conduct or explains otherwise ambiguous behavior, but which is not introduced for the purpose of proving or disproving an element of the charged offense, will not support related offense instructions.

(3) The defendant has relied on a defense at trial which is consistent with a conviction for the uncharged offense. This third prong of the test was described in *Geiger* as follows:

"Finally, the instructions must be justified by the defendant's reliance on a theory of defense that would be consistent with a conviction for the related

offense. Thus, the instruction need not be given if the defense theory and evidence reflect a complete denial of culpability as when the defense is alibi, or the only issue is identity, unless the defendant argues that the evidence at most shows guilt only of the related offense." (35 Cal.3d at pp. 531-532.)

 In this case, the evidence that appellant told Kesha to drive away was not offered to prove or disprove any of the elements of the charged robbery and murder, so it cannot be the basis for an instruction for a lesser related offense. At most this evidence was an implied admission that appellant was, indeed, present at the scene. As such it was clearly cumulative and of indescribably minute value. At any rate, such evidence was only relevant to identity, which, as stated, will not support related offense instructions. Additionally, this evidence would not provide a basis for a finding that the defendant was guilty of being an accessory to a felony. As the trial court correctly explained, accessory to a felony requires a certain specific intent and the basis that appellant sought to rely on, expressly included a denial of such intent. There was no other evidence, whatsoever, to support a finding of this specific intent. Finally, as is correctly noted in his opening brief, appellant "denied any intent to have anything to do with the robbery and shooting." Appellant testified that he wanted to leave the scene because he didn't want to have any part of the crime and he had no reason to stay at the scene. The defense argument at trial was simply and completely that appellant "didn't do anything wrong." Appellant's argument on appeal that the jury "could believe" that he had assisted in the getaway is not the same thing as defense reliance on such a theory at trial. Therefore, in light of the fact that appellant failed to meet any of the criteria required for lesser related offense instructions, the trial court's refusal to so instruct was correct.

II

*Instructions Regarding Accomplice Testimony*

Neither side disputes the fact that Daryl was the actual murderer in this case. Appellant contends that the trial court should have instructed the jury regarding the testimony of an accomplice in accordance with CALJIC Nos. 3.11, 3.12, 3.16, and 3.18. Daryl's in-court testimony, if believed, was exculpatory as to appellant's involvement because he testified that he did not recognize appellant and, to his knowledge, had never met him. However, there was substantial evidence upon which the jury could find that appellant was the person that Daryl referred to as Wine-O in his taped statement to the police. It is the contents of this taped statement which constitutes the accomplice statements for which cautionary instructions apply. Contrary to respondent's argument, the fact that the court gave CALJIC

No. 2.21.2 which instructed the jury to distrust the testimony of a willfully false witness, coupled with the inescapable conclusion that Daryl was a willfully false witness, does not satisfy the requirement for cautionary instructions related to accomplice testimony. Even though, by their verdict, the jurors clearly did more than distrust Daryl but, in fact, obviously found his in-court testimony to be untrue, this does not resolve the issue. Also, even though, as respondent points out, there was, in fact, ample corroboration for Daryl's testimony, this does not eliminate the need to instruct the jury regarding the necessity of corroborating evidence to support the testimony of an accomplice. ■ The trier of fact must find that the testimony of an accomplice is corroborated by other evidence. ■ This is not the type of finding that we could presume a jury would be aware of absent specific instructions.

We conclude, therefore, that the trial court should have given the jury cautionary instructions regarding accomplice testimony.

We next turn to the effect of this instructional error. Evidence of Daryl's statement to the police which served to incriminate appellant was first presented in the People's case-in-rebuttal after the defense had rested. There was an abundance of evidence at the close of the People's case-in-chief to support the verdicts of the jury as to both counts. The defense consisted of appellant's testimony that he was present at the scene, but he was not involved in the robbery, that he never touched the victim and, in fact, was never closer than five feet from the victim at any time. The essence of the rebuttal evidence from Daryl was that he and the person he identified to the police as a person named Wine-O, planned to rob the victim because they had been led to believe that he was a dope dealer who always carried a large amount of cash. Daryl told the police that Wine-O had the gun, stole the lunch pail, and shot the victim as the victim was "trying to rush for the gun."[3]

As mentioned, neither side disputes that Daryl was the actual shooter. The part of statement made to the police by Daryl five days after the crime in which he denied being the shooter, in light of the evidence presented in this case, including his in-court testimony in which he said he couldn't remember whether or not he was the actual shooter, is not capable of belief. Only after the jury concluded that Wine-O was actually appellant, that Daryl was lying about never meeting him and that Daryl was lying about who did what in the robbery, would the jury be able to extract from Daryl's previous statement to the police any evidence which incriminated appellant. This evidence was

---

[3]It should be noted that appellant testified that Daryl told him that he (Daryl) shot the victim in self-defense.

that appellant, in fact, was involved in the robbery, and it also explained the reason for picking this particular victim. The evidence explaining the reason for picking the victim added nothing to the case other than to satisfy irrelevant curiosity, and the indication that the victim may have been a drug dealer would only serve to benefit appellant by portraying the victim in a negative light. The other aspect of Daryl's statement, from which the jury could discern that appellant was involved in the crime, was fully presented by the witnesses in the People's case-in-chief, and the value of this cumulative evidence, from this, the least credible of all of the witnesses, would be of such minute value that its weight would be zero. Therefore, the trial court's failure to give the jury the required cautionary instructions regarding accomplice testimony was harmless.

### III

### *Instruction Regarding a Willfully False Witness*

■ Appellant contends that the trial court erred in instructing the jury with CALJIC No. 2.21.2. That instruction provides:

"A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." (CALJIC No. 2.21.2 (5th ed. 1988).) Appellant contends that based on the prosecutor's argument to the jury that appellant's testimony was false, the instruction could be viewed as applying exclusively to appellant's testimony. This, it is argued, would shift the prosecution's burden of proof by allowing the jury to reject appellant's testimony unless from all the evidence the jury believed the probability of truth favored his testimony. Appellant concludes that the instruction thereby increased the defense burden from raising a reasonable doubt, to one of affirmatively proving a defense. Appellant cites two cases in support of this argument. Appellant notes that in *People* v. *Lescallett* (1981) 123 Cal.App.3d 487, 493 [176 Cal.Rptr. 687], the First District Court of Appeal opined that: "It may be, as suggested by Lescallett, that such an instruction should be avoided where, under the circumstances of the case, it might appear to be directed principally toward a defendant's exculpatory testimony." Appellant fails to quote the very next sentence in *Lescallett* which states: "But here Lescallett did not testify at the trial and he was accordingly not so prejudiced." (*Id.* at p. 493.) *Lescallett* does not support appellant's position any more than a court's statement that "the earth may be flat but that's not an issue in this case" would support a later assertion that the court found that

the earth may be flat! The second case cited by appellant is *People* v. *Beardslee* (1991) 53 Cal.3d 68, 94-95 [279 Cal.Rptr. 276, 806 P.2d 1311]. Appellant correctly notes that the Supreme Court in *Beardslee* rejected a similar claim based on the dictum in *Lescallet,* but appellant seeks to distinguish the facts in *Beardslee* from this case. To the extent that appellant believes that the *Beardslee* court approved of the dictum in *Lescallett,* appellant is mistaken. The ruling of the *Beardslee* Court with cites removed is as follows:

" 'Thus CALJIC No. 2.21. does nothing more than explain to a jury one of the tests they may use in resolving a credibility dispute.' [Citation.] 'The weaknesses in [the defendant's] testimony should not be ignored or given preferential treatment not granted to the testimony of any other witness. As it has been aptly noted in other contexts, a defendant who elects to testify in his own behalf is not entitled to a false aura of veracity. [Citations.]' There was no error in giving the instruction in accordance with the parties' requests." (*People* v. *Beardslee, supra,* 53 Cal.3d at p. 95 [second bracketed insertion appears in original].) It is not clear from the record before this court whether this instruction was requested by one side, both sides, or simply given in accordance with the court's sua sponte duty to instruct the jury as to the applicable law. It is clear that neither side objected to its use upon being asked and that both sides argued the application of this instruction in support of their theory of the case (the People argued its application to appellant's testimony, and the defense argued its application to Daryl's testimony). Even absent a request by the defense, however, the instruction was proper for the reasons well-stated by our Supreme Court in *Beardslee.* (*Id.* at pp. 94-95.)

## IV

In light of our findings that there was no error as to the first and third contentions of error, and that the error regarding cautionary instructions for accomplice testimony was harmless, appellant's cumulative effect of error argument necessarily fails.

## V

Respondent concedes that the abstract of judgment must be corrected to reflect the sentence of the trial court.

## VI

### *Disposition*

The abstract of judgment is ordered corrected to reflect a sentence of 25 years to life on the murder charge plus a consecutive 1-year enhancement

pursuant to Penal Code section 12022, subdivision (a)(1). As regards the robbery charge, the abstract is ordered corrected to reflect a sentence of five years on the robbery count plus one year for one Penal Code section 12022, subdivision (a)(1) enhancement and further corrected to reflect that the sentence on this charge is stayed pursuant to Penal Code section 654. In all other respects the judgment is affirmed.

Nott, J., concurred. Gates, Acting P. J., concurred in the judgment only.

Appellant's petition for review by the Supreme Court was denied April 15, 1993.