[No. A056509. First Dist., Div. Two. July 28, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
KEVIN LAMAR LIPSCOMB, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B. and III.C.

## COUNSEL

Barbara Michel, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Violet M. Lee and Christopher Grove, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BENSON, J.**—Following a jury trial, defendant Kevin Lamar Lipscomb was convicted of one count of first degree robbery (Pen. Code, §§ 211-212.5);[1] one count of false imprisonment by means of violence (§§ 236-237); one count of assault with a firearm (§ 245, subd. (a)(2)); and related firearm use enhancements (§ 12022.5). On appeal, defendant contends, inter alia, that his assault conviction must be reversed because the trial court improperly refused his request for a lesser related offense instruction on brandishing a weapon (§ 417, subd. (a)(2)). We disagree and affirm.

## I. STATEMENT OF FACTS

Contra Costa County Deputy Sheriff Richard West testified that on the morning of September 6, 1991, he was parked on a freeway on-ramp watching for a white van with dark stripes. When he saw the van, he began following it and notified the police dispatcher to alert the Vallejo police. As the van passed through a toll booth, West noticed a California Highway Patrol car parked at the toll plaza and activated his lights and siren. The van sped up and exited the freeway. After following the van through the streets,

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

West noticed the front passenger door open; he heard two shots fired and veered out of the line of fire. The van turned the corner, and West saw two men exit the van, both carrying weapons. He did not see their faces and was unable to identify them.

California Highway Patrol Officer Joseph Hoey testified that he followed West's car in pursuit of the van. He corroborated West's testimony that an occupant of the van shot at the officers during the chase and that the occupants eventually fled the van on foot. Hoey identified defendant as the man who exited the driver's side of the van. Hoey aimed his service revolver at defendant but was unable to get a good aim on defendant, who was running away from Hoey and toward a house. Defendant was holding a handgun and was carrying a bag in his right hand.

Dennis Hedrick testified that on September 6, 1991, he lived on Wilshire Avenue in Vallejo. At approximately 11:30 that morning, he was outside painting in his backyard when he heard gunshots. He went toward the garage to close the door; before he was able to do so, defendant ran into the garage with a gun in hand. Defendant pointed the gun at Hedrick, ordered him into the house, and warned that he "didn't want to have to shoot." Hedrick complied because defendant "was pointing a gun at me." Once in the house, defendant told Hedrick to lie on the floor. Although Hedrick was scared, he refused to lie on the floor because of a back injury and because he did not want to be intimidated. Defendant again ordered Hedrick onto the floor, and he again refused. Defendant walked away and went to close a sliding door.

There was a police car in front of the house, so defendant and Hedrick moved into the living room, where they could not be seen. Defendant then told Hedrick "just to go to the back of the house[ ] that I don't want to have to shoot you." They proceeded into Hedrick's bedroom. Defendant sat on the bed and emptied the pillowcase he was holding. Inside, there were bundles of cash and a rubber stamp. Hedrick noticed defendant had put the gun's safety into the "on" position and had placed the gun on the floor. Defendant used the telephone to call someone to pick him up. After completing the call, defendant was going to tear the telephone from the wall, but Hedrick persuaded him simply to disconnect it.

Defendant asked for some slacks he could wear; Hedrick told him they would have to get them from another room. While Hedrick searched for pants, he noticed that defendant was removing his pants and had left the gun in the other room. Hedrick pushed defendant into some boxes. Defendant pulled Hedrick's shirt over his head and went to get the gun. Hedrick broke a window and was attempting to escape when defendant returned, pointed

the gun at him, and warned that he didn't want to shoot him. The gun's safety had been turned off.

Defendant and Hedrick went back into the bedroom where defendant again ordered Hedrick onto the floor. Hedrick again refused and sat near a desk. After a time, they went to the front room to see if defendant's friend had arrived to pick him up. Defendant began going through the contents of his sack and told Hedrick he was going to leave some money for him. Although Hedrick said he did not want any of the money, defendant left a stack of money on top of a microwave stand. After a few minutes, they heard a car pull into the driveway, and defendant went to meet his friend. Hedrick heard defendant's friend ask, " '. . . what about the guy that lives here?' " Defendant responded, " 'don't worry about him. He's okay.' " Defendant then went through the house collecting the telephone cords. Defendant told Hedrick they were leaving and warned him to stay in his chair and not call anybody. Hedrick briefly remained in his house and then went to a neighbor's home and contacted the police.

That night, Vallejo police executed a search warrant at defendant's home. They found a box of nine-millimeter bullets and the magazine of a gun. Two spent nine-millimeter casings were found on the road near the location where the officers testified they heard shots being fired at them. The police also found a pair of black cloth gloves and a black baseball cap with the name "Kevin" written inside. Defendant's fingerprint was found on the gloves.

## II. STATEMENT OF THE CASE

By information filed October 11, 1991, defendant was charged with assault with a firearm upon a peace officer (count 1, § 245, subd. (d)(1)); first degree residential robbery (count 2, §§ 211-212.5); false imprisonment by means of violence (count 3, §§ 236-237); burglary (count 4, § 459); and assault with a firearm (count 5, § 245, subd. (a)(2)).[2] The information also alleged in connection with each count that defendant personally used a firearm. (§ 12022.5.)

On December 12, 1991, the jury acquitted defendant of count 1 and found him guilty of counts 2, 3, and 5 as charged. The jury was unable to reach a verdict on count 4, which was dismissed on the motion of the prosecutor.

On January 24, 1992, the trial court sentenced defendant to the six-year upper term on count 2 and to a consecutive three-year lower term on the

[2]Before amendment, the information contained six counts. The original count 1, charging second degree robbery (§§ 211-212.5), was dismissed, and the remaining counts were renumbered.

firearm use enhancement. The court stayed sentence on the remaining counts pursuant to section 654.

This timely appeal followed.

## III. DISCUSSION

### A. *The Trial Court Properly Refused Defendant's Request for an Instruction on Brandishing a Weapon.*

At trial, defendant requested that the jury be given the following instruction on brandishing a weapon (§ 417, subd. (a)(2)): "Every person who, except in self-defense, in the presence of another person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry or threatening manner, or who in any manner unlawfully uses the same in any fight or quarrel is guilty of a crime." (See generally CALJIC No. 16.290 (5th ed., 1993 pocket pt.) p. 129.) The trial court refused to give the instruction. ▇ Defendant now contends his conviction for assault with a firearm must be reversed because brandishing is a lesser related offense on which the jury should have been instructed. Under the circumstances of this case, an instruction on brandishing was not required.

▇ In *People* v. *Geiger* (1984) 35 Cal.3d 510, 531 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055], our Supreme Court attempted "to define the circumstances in which a defendant is entitled to instructions on related, but not necessarily included, offenses."[3] The court described three prerequisites for such instructions. First, "where there is no evidence that the offense is less than or other than that charged and instructions need not be given on lesser included offenses, they need not be given on lesser related offenses. If the jury disbelieves the People's evidence in these cases, there is no incentive to convict and no conflict with the right to a reliable factfinding process. Therefore, the first prerequisite to receiving instructions on lesser related offenses must be the existence of some basis, other than an unexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged. [¶] Second, the offense must be one closely related to that charged and shown by the evidence." (35 Cal.3d at p. 351.) "Finally, the instructions must be justified by the defendant's reliance on a theory of defense that would be consistent with a conviction for the related offense." (*Ibid.*)

---

[3]The Supreme Court expressly recognized that it could not "anticipate all of the varied circumstances in which instructions on related offenses may be requested. We do not foreclose the possibility that experience will teach that these criteria are over- or underinclusive." (*People* v. *Geiger, supra,* 35 Cal.3d at p. 532, fn. 12; see also *People* v. *Hill* (1993) 12 Cal.App.4th 798, 804 [15 Cal.Rptr.2d 806].)

■ The first prerequisite of *Geiger* is not met in this case. It is undisputed that the victim Hedrick, having heard gunshots, went from his backyard to his garage, intending to close the garage door. Before Hedrick could close the door, defendant ran into the garage with a gun in hand, pointed the gun at Hedrick, ordered Hedrick into the house, and warned Hedrick "he didn't want to have to shoot." Hedrick complied because defendant "was pointing a gun at me." At this point, absent some "unexplainable rejection of prosecution evidence" (*People* v. *Geiger, supra*, 35 Cal.3d at p. 531), the assault with a firearm was complete.

As our Supreme Court observed some 136 years ago in the oft-quoted case of *People* v. *McMakin* (1857) 8 Cal. 547, 548-549, "It is true, the threat was conditional, but the condition was present, and not future, and the compliance demanded was immediate. ■ Where a party puts in a condition which must be at once performed, and which condition he has no right to impose, and his intent is immediately to enforce performance by violence, and he places himself in a position to do so, and proceeds as far as it is *then* necessary for him to go in order to carry out his intention, then it is as much an assault as if he had actually struck, or shot, at the other party, and missed him. It would, indeed be a great defect in the law, if individuals could be held guiltless under such circumstances." (Italics in original.) As the Supreme Court later explained in *People* v. *Yslas* (1865) 27 Cal. 630, 634, "[i]f [a defendant] is advancing with intent to strike his adversary and comes sufficiently near to induce a man of ordinary firmness to believe, in view of all the circumstances, that he will instantly receive a blow unless he strike in self defense or retreat, the assault is complete."

This is precisely what happened in this case. Hedrick was ordered into his house at gunpoint and complied because defendant "was pointing a gun at me." ■ In short, "there is no evidence that the offense is less than or other than that charged." (*People* v. *Geiger, supra*, 35 Cal.3d at p. 531.) If the jury believed Hedrick's testimony, it had no choice but to find defendant guilty of assault with a firearm. If the jury did not believe Hedrick's testimony, it had to find defendant not guilty. There is simply no evidence suggesting the initial encounter between Hedrick and defendant was not an assault with a firearm. (See *People* v. *Harlan* (1990) 222 Cal.App.3d 439, 450-451 [271 Cal.Rptr. 653].)

Defendant asserts his statements that he "didn't want to have to shoot" Hedrick demonstrate that he never intended to commit a battery and thus could not be guilty of assault. (See *People* v. *Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479 P.2d 372].) Not so. A good, decent, and law-abiding

citizen confronted by a gun-wielding assailant who, on threat of death, invades the sanctity of his home would be shocked to learn that his assailant's culpability turns on such esoteric distinctions as whether the assailant used the words "I don't want to have to shoot" rather than "do what I say or I'll shoot." The law does not require such an absurd result. (See *People* v. *Hill, supra*, 12 Cal.App.4th at p. 805 ["the first prerequisite to receiving instructions on lesser related offenses must be the existence of some reasonable basis on which the jury could find that the burden of proof as to the offense charged has not been met"].)

In any event, even if defendant were correct in his assertion the prerequisites set forth in *Geiger* were met in this case, we would nonetheless conclude that reversal is unwarranted. As noted above, the Supreme Court has expressly recognized that the prerequisites set forth in *Geiger* may be overinclusive. (See *ante*, fn. 3.) Thus, in determining whether *Geiger* applies in a particular case, we cannot simply engage in a talismanic recitation of its stated prerequisites. ▆▆▆ Rather, we must look to the underlying purpose of requiring instructions on lesser related offenses, which is " '. . . to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between [guilt] and innocence' "—that is, to eliminate " '. . . the risk that the jury will convict . . . simply to avoid setting the defendant free. . . .' " (*Schad* v. *Arizona* (1991) 501 U.S. ___, ___ [115 L.Ed.2d 555, 575, 111 S.Ct. 2491, 2505].)

▆▆▆ In this case, there was no such risk. To the contrary, the jury, confronted with defendant's use of a gun, was not faced with an all-or-nothing choice between finding defendant guilty of assault with a firearm and setting him free. Rather, the jury had the option of, and did in fact, convict defendant of false imprisonment by means of violence, of first degree robbery and of related firearm use enhancements. Under these circumstances, the need " '. . . to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between [guilt] and innocence' " (*Schad* v. *Arizona, supra*, 501 U.S. at p. ___ [115 L.Ed.2d at p. 575, 111 S.Ct. at p. 2505) was simply not present.[4]

---

[4]Defendant's focus on each count of the complaint separately is much too narrow. As noted in the text, the purpose of lesser related offense instructions is to eliminate " '. . . the risk that the jury will convict . . . simply to avoid setting the defendant free. . . .' " (*Schad* v. *Arizona, supra*, 501 U.S. at p. ___ [115 L.Ed.2d at p. 575, 111 S.Ct. at p. 2505].) In this context, it matters not one iota that the options available to the jury are contained in different counts.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is affirmed.

Kline, P. J., and Smith, J., concurred.

A petition for a rehearing was denied August 20, 1993, and appellant's petition for review by the Supreme Court was denied October 28, 1993. Kennard, J., was of the opinion that the petition should be granted.

*See footnote, *ante*, page 564.