[No. E011383. Fourth Dist., Div. Two. Dec. 6, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE RIVERS, Defendant and Appellant.

**COUNSEL**

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DABNEY, J.**—A jury convicted defendant and appellant Lee Rivers of robbery (Pen. Code, § 211)[1]; defendant having waived a jury on enhancement allegations, the court then found true the allegation that defendant had suffered a prior serious felony conviction within the meaning of section 667, subdivision (a). Defendant was sentenced to a total term of eight years, comprised of the three-year midterm for the robbery, and a five-year enhancement.

On this appeal, defendant argues that the CALJIC No. 2.21.2 impermissibly and prejudicially authorized the jury to believe testimony based only upon a "probability" that it was truthful, thus lessening the prosecution's burden of proof. He also alleges error in the trial court's refusal to allow him to represent himself. We find merit only in his second contention, but find the error harmless. Accordingly, we affirm the judgment.

### STATEMENT OF FACTS

The prosecution presented only two witnesses, Edward Plunkett, the victim, and Officer Valmont Graham, who apprehended defendant. Plunkett's testimony was by far the more important, and it was towards his testimony that the challenged instruction obviously related.

In short, Plunkett testified that, on the night of the incident, he had been drinking in a downtown Riverside bar. After he left around midnight, he was

---

[1] All further statutory references are to the Penal Code.

approached by defendant and codefendant Michael Joe McGlothan,[2] who asked him if he had any money to spare. Plunkett had a $20 bill and a $1 bill at the time, and told them he could help them.

However, the conversation "drifted into coke rock," and it was agreed that Plunkett would purchase $10 worth of cocaine from the pair. Plunkett followed the pair to a secluded area, where he was "blind side punched" and knocked down by defendant. A scuffle ensued between Plunkett and defendant, with the companion, McGlothan, eventually stepping in to help defendant. Plunkett was briefly choked, and the two men seized his money from his pants pocket and fled.

Plunkett followed, and saw a white Cadillac taking off down the street. As he pursued the car, he found it stopped by the police nearby. He approached, and told the police that he had been robbed of $21. He identified defendant and his companion to the police, but did not identify a third man.

A photograph of Plunkett taken at the time showed his shirt out of the waistband and unbuttoned almost to the waist; there were red marks around his neck and jaw and blood on his face. His jacket was dirty, inferrably from the fall and scuffle.

On cross-examination, Plunkett admitted that he had not told the police officers that the robbery had its genesis in an arranged drug sale. He denied that the drug purchase had been consummated, that he had been given fake cocaine, and that he had fabricated the robbery report out of anger and a desire for revenge.

Officer Graham made an unrelated traffic stop on the white Cadillac immediately after the incident. He testified that Plunkett ran up and said that he had just been robbed by "those guys." Plunkett was out of breath, his clothes were disheveled, and he had what appeared to be fresh scratches on his face. Plunkett told him that the driver of the Cadillac was not involved, but identified defendant and McGlothan.

Defendant also had a fresh scratch on his face; he attempted to prevent a photograph being taken. He claimed to have received the scratch while trimming a tree, although this was not consistent with its fresh appearance. A crumpled-up $20 bill and $1 bill were found in defendant's sock. Fake rocks of cocaine were found in his shirt pocket.

Finally, Officer Graham testified that Plunkett did not appear to be drunk at the time and spoke coherently.

---

[2]McGlothan was acquitted of the charges against him.

DISCUSSION

A.

*The Giving of CALJIC No. 2.21.2*[3]

■ As instructed, the jury was informed that "A witness who is willfully false in one material part of his or her testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." Defendant argues that because the jury was told that it could use a *probability* standard to determine whether or not to accept some of Plunkett's testimony, the instruction conflicts with the "beyond a reasonable doubt" standard imposed on the prosecution. (See § 1096, codifying the standard; *In re Winship* (1970) 397 U.S. 358, 361-362 [25 L.Ed.2d 368, 373-374, 90 S.Ct. 1068].)

The People rely on cases in which the instruction was challenged on the basis that it improperly increased the defendant's burden when he testified, by telling the jury that his exculpatory testimony should not be accepted unless it was favored by the "probability of truth"; accordingly, it has been argued that this is a heavier burden than that of merely raising a reasonable doubt. This position has been repeatedly rejected. (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 94-95 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Hill* (1993) 12 Cal.App.4th 798, 809-810 [15 Cal.Rptr.2d 806].) In *Beardslee*, for example, the court held that the language "is merely a statement of the obvious—that the jury should refrain from rejecting the whole of a witness's testimony if it believes that the probability of truth favors any part of it."

The considerations, however, are slightly different when the instruction is applied to a prosecution witness who provides the critical evidence against the defendant. In this case, Plunkett's testimony about the actual circumstances under which defendant took his money was not corroborated; defendant's flight, and even the evidence of a scuffle, could have been explained by

---

[3]The court decided to give CALJIC No. 2.21.2 because it felt that Plunkett's testimony concerning his reasons for not mentioning drugs to the officer was arguably inconsistent with the officer's testimony concerning what was said at the site. We express no opinion on the propriety of the instruction from the point of view of the prosecution; however, we do note that the only "evidence" that the robbery report itself was totally fabricated came from the insinuations of defense counsel.

the suggested theory of an attempt to cheat Plunkett in a drug deal.[4] Thus, Plunkett's credibility on the issue of the taking—whether forcibly before any transfer of contraband, or consensually as payment for cocaine—was crucial. An instruction which told the jury that this testimony could be accepted based on a "probability" standard is somewhat suspect.

However, a similar argument was rejected in *People* v. *Salas* (1975) 51 Cal.App.3d 151 [123 Cal.Rptr. 903], in which the defendant asserted that the "reasonable doubt" standard was undermined by an instruction which arguably encouraged the jury to decide disputed factual issues based on evidence "which appeals to your mind with more *convincing force.*" (Italics supplied.) Although the court observed that "[a]ppellant's argument would have considerable weight if this instruction stood alone," it held that because the jury was properly instructed on the general governing principle of "reasonable doubt," and was told to consider all the instructions as a whole, there was no error. (51 Cal.App.3d at pp. 155-157; accord, *People* v. *Clay* (1984) 153 Cal.App.3d 433, 461-462 [200 Cal.Rptr. 269].)

■ "It is well established in California that the correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People* v. *Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251], citing *Salas, supra*.) ■ Here, as in *Salas* and *Clay*, the jury was instructed on reasonable doubt in the language of CALJIC No. 2.90, which directed the jury to decide based upon "the entire comparison and consideration of all the evidence." It was also instructed to "consider the instructions as a whole and in light of all the others." (CALJIC No. 1.01) In *Salas*, the court held that where these instructions were also given, it was clear that the jury was instructed to weigh "the relative convincing force of the evidence . . . only as part of the process of determining whether the prosecution had met its fundamental burden of proving appellant's guilt beyond a reasonable doubt. . . ." (51 Cal.App.3d at p. 157.)

As noted above, we have some concerns about the use of the instruction where it affects the crucial testimony of a sole percipient witness. However, we follow *Salas* here in part because, as in *Clay*, there is no possibility of prejudice.

The trial court apparently believed that CALJIC No. 2.21.2 was justified due to inconsistencies between Plunkett's testimony concerning his explanations to the officers, and Officer Graham's testimony. However, there were no material variations.

---

[4]This possibility was supported by the chunks of "fake cocaine" found on defendant's person.

Plunkett testified that he did not recall telling the officer that defendant asked him for 75 cents to buy alcohol, but testified that he told the officer that he had gone with defendant and his companion to make change, or break his $20 bill. Officer Graham testified that defendant told him that the three of them had been discussing going to a diner for coffee, and *also* told him that defendant then asked for 75 cents for alcohol and they went into an alley to get change. Plunkett *admitted* on cross-examination that his true purpose for accompanying the other two into a dark shed was to consummate a drug purchase, and that he had deliberately failed to tell the officers this.

Plunkett's lack of recollection concerning his having told Officer Graham that defendant wanted 75 cents to buy alcohol was on a trivial point; even if he had positively testified that he had not said this, the discrepancy would have been insignificant because he did testify, consistently with Officer Graham, that he had told a story about making change in the alley. He also admitted that he had concealed the proposed drug transaction. His testimony was not subject to doubt on these factual points.

The only *material* fact as to which Plunkett testified, which the jury might have found false, was the fact central to the prosecution's case: that defendant had jumped him and taken his money by force, before any drug sale took place. If the jury had found him willfully false in this testimony, it would have acquitted defendant without further ado. Obviously it found him truthful, and Plunkett gave no other testimony which could have been found willfully false on a material point. Thus, CALJIC No. 2.21.2 cannot have come genuinely into play. Even if we were to find error, we would hold it harmless beyond a reasonable doubt. (Cal. Const. art. VI, § 13; *Rose* v. *Clark* (1986) 478 U.S. 570, 576-579 [92 L.Ed.2d 460, 469-471, 106 S.Ct. 3101].)

B.

### The Denial of the Faretta Motion

After the jury returned its verdict on the robbery charge, as the court proposed to take up the allegation of the prior conviction, defendant asked for "everything pertaining to my counselor that's written on paper before we got any further on proceedings." When the court asked for clarification, counsel said "I think in a way what he's doing is like a *Marsden* hearing,[5] wants to take over pro per from this point on is what I think it is." Defendant said "That's right."

Without discussion or inquiry, the court denied the request as untimely. This was error.

---

[5]*People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

■ If a defendant makes a timely request for self-representation under *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], his right to do so is unconditional and the trial court must grant the request. However, "timely" means "within a reasonable time prior to commencement of trial" (*People* v. *Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187]), and a later request is within the discretion of the trial court to grant or deny. (*Ibid.*)

■ As the trial court recognized, defendant's request, coming *during* trial, was not timely. Although a bifurcated trial on allegations of a prior conviction has some of the elements of a separate trial, the court in *People* v. *Givan* (1992) 4 Cal.App.4th 1107, 1114 [6 Cal.Rptr.2d 339], concluded that proceedings on the priors was merely a part of the trial, so that a motion for self-representation made before that portion of proceedings was not timely. The court relied on *People* v. *Hamilton* (1988) 45 Cal.3d 351, 369 [247 Cal.Rptr. 31, 753 P.2d 1109], in which the Supreme Court held that, for *Faretta* purposes, the penalty phase in a capital case was "merely a stage in a unitary trial." (See also *People* v. *Hardy* (1992) 2 Cal.4th 86, 193-195 [5 Cal.Rptr.2d 796, 825 P.2d 781], following *Hamilton.*)

Although in this case, some of the factors which influenced the court in *Hamilton* and *Hardy* do not apply—for example, defendant waived a jury on the priors, so that the issue would not here be determined by the same trier of fact that decided guilt—we nevertheless agree with the *Givan* court that defendant's request came in "midtrial" of a proceeding which had been divided into separate components for defendant's benefit. It was therefore not timely and the trial court was not absolutely required to grant it.

■ However, the record fails to demonstrate that the trial court exercised its discretion on the motion. ■ *Windham* instructs the trial court faced with an untimely request under *Faretta* to consider such factors as "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*People* v. *Windham, supra,* 19 Cal.3d at p. 128; *People* v. *Hardy, supra,* 2 Cal.4th at p. 195.)

As the Attorney General points out, one reason for requiring the court to undertake such an inquiry is to ensure that the record permits meaningful appellate review. (2 Cal.4th at p. 195.) The Attorney General then argues that the record here is sufficiently developed to permit such review. This approach ignores the fact that the court's consideration of the *Windham* factors is also obviously designed to ensure that the exercise of discretion is

informed and thoughtful. It also ignores the fact that the record here does not establish that any exercise of discretion by the trial court was reasonable.

■ The Attorney General asserts that "the trial judge safely concluded that the record already sufficiently demonstrated the quality of counsel's representations, the lack of any prior interest in appellant's part in representing himself, and the stage of the proceedings at which the request was made." We find it difficult to interpret the trial court's immediate denial of the request as demonstrating that it gave any consideration whatsoever either to the state of the record or the *Windham* factors.

While the trial court may conceivably have given thought to the quality of counsel's representation, a defendant dissatisfied with counsel must be permitted to recount specific examples of claimed inadequacy; the court may not rely solely on its courtroom observations. (*People* v. *Marsden, supra,* 2 Cal.3d 118, 124; *People* v. *Hill* (1983) 148 Cal.App.3d 744, 753 [196 Cal.Rptr. 382].) The *Marsden* principles apply equally when a request for self-representation has been made. (*People* v. *Hernandez* (1985) 163 Cal.App.3d 645, 653 [209 Cal.Rptr. 809].) In this case, defendant was not given the chance to explain his desire to represent himself.

We also reject the Attorney General's reliance on defendant's failure to make any earlier requests for self-representation as somehow demonstrating the whimsical nature of his request. This factor is usually employed against the defendant who has made numerous requests for new counsel or who has demanded counsel after obtaining self-representation privileges. (See *People* v. *Williams* (1990) 220 Cal.App.3d 1165, 1168-1170 [269 Cal.Rptr. 705], upholding denial where defendant, "by juggling his *Faretta* rights with his right to counsel interspersed with *Marsden* motions," was found to be "playing 'the *Faretta* game.'") Here, by contrast, defendant had made no earlier motions which would support a conclusion that the instant request was made for an improper purpose.

As for the stage of the proceedings, we agree that it is clear from the record, but find that the timing of the request does not militate in favor of the ruling. As the Attorney General concedes, the trial court apparently did not consider whether any delay would be necessary. We note that defendant did not request a continuance of the hearing on the priors. (See *People* v. *Tyner* (1977) 76 Cal.App.3d 352, 355 [143 Cal.Rptr. 52], noting this as a factor in favor of granting the self-representation request.) We do realize that defendant might have sought a continuance had his *Faretta* motion been granted, but even if he had, the potential for disruption would appear to have been minimal.

 It remains to consider the effect of the error. Error in denying a *timely Faretta* motion is reversible per se. (*People* v. *Joseph* (1983) 34 Cal.3d 936, 948 [196 Cal.Rptr. 339, 671 P.2d 843].) However, once trial has commenced, the right to self-representation is no longer based on the Constitution. (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1220 [259 Cal.Rptr. 669, 774 P.2d 698], citing *People* v. *Windham*, *supra*, 19 Cal.3d at p. 129, fn. 6.) In *People* v. *Crandell* (1988) 46 Cal.3d 833, 863-866 [251 Cal.Rptr. 227, 760 P.2d 423], the court rejected the contention that an erroneous failure to appoint advisory counsel (*People* v. *Bigelow* (1984) 37 Cal.3d 731, 742 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]) was reversible per se, in that ". . . the right to the assistance of counsel, guaranteed by the state and federal Constitutions, has never been held to include a right to the appointment of advisory counsel. . . [citation]." Citing *People* v. *Chavez* (1980) 26 Cal.3d 334, 344-348 [161 Cal.Rptr. 762, 605 P.2d 401], in which an erroneous refusal to permit defendant to explain why he desired the appointment of specific counsel was held not to be reversible because no prejudice appeared on the record, the court in *Crandell* applied the "harmless error" test as set out in *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

By delaying his *Faretta* motion until virtually the end of proceedings, defendant waived, or forfeited, his absolute constitutional right. His right was based on case law (e.g. *People* v. *Windham*), as was that in *Crandell*. Thus, we conclude that although the court erred in its handling of his request under the applicable precedents, this error is not automatically reversible, but is reviewed under the "harmless error" test of *Watson*. That case, construing what is now article VI, section 13 of the California Constitution, defined the standard as whether in the absence of the error, it is "reasonably probable" that a result more favorable to the appellant would have been reached. We therefore proceed to apply this standard.

It is true that it is routinely held that any *substantial impairment* of the right to counsel is reversible per se. Thus, in *People* v. *Hosner* (1975) 15 Cal.3d 60, 70 [123 Cal.Rptr. 381, 538 P.2d 1141], the court held that the denial of a transcript of defendant's first trial, which ended in a mistrial, was reversible per se because the lack of the transcript might have impaired the efficiency of counsel at his second trial. *Hosner* is typical of such cases, which rest upon the principle that the effect of deprivals of competent, effective counsel are generally impossible to fairly evaluate.[6] (See also *People* v. *Ivans* (1992) 2 Cal.App.4th 1654, 1666 [4 Cal.Rptr.2d 66], in

---

[6]See, however, *People* v. *Tarver* (1991) 228 Cal.App.3d 954, 957-958, footnote 1 [279 Cal.Rptr. 368], in which the court reluctantly followed *Hosner* and reversed, but criticized the "possible unfairness and inappropriateness" of the rule of per se reversal. In *Tarver*, the court

which this court, following *People* v. *Lewis* (1978) 20 Cal.3d 496, 499 [143 Cal.Rptr. 138, 573 P.2d 40], reversed for *Marsden* error [a failure to inquire into defendant's reasons] on the basis that it was not possible to conclude beyond a reasonable doubt that some dereliction of counsel did not exist and had not contributed to the guilty verdict.)[7]

■ In this case there was no deprivation of counsel in the sense of denial or absence. As noted above, it is conceivable that defendant had some instances of ineffectiveness which he could have presented to the court had he been asked. However, the record is devoid of any indication that defendant wished to challenge the *completed* proceedings by way of a motion for new trial. (Cf. *Ivans*, *supra*, 2 Cal.App.4th 1654) Apparently he said nothing of the sort to his attorney, and certainly nothing to the trial court. He simply confirmed that he wanted to represent himself.[8]

We therefore consider it proper to evaluate the error in light of the *subsequent* proceedings. It is candidly recognized that a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel. (See, e.g., *Faretta*, 422 U.S. at p. 834 [45

---

found the evidence of guilt "overwhelming" and could "confidently" say that the error was harmless beyond a reasonable doubt; it indicated that, if it were free to do so, it would affirm the judgment.

[7] The transcript leaves it somewhat unclear what it was that defendant really wanted; defense counsel first restated defendant's complaints as "like a *Marsden* hearing," but then "clarified" that defendant "wants to take over pro per from this point on. . . ." We have accepted defendant's position on appeal that his affirmation "That's right" referred to the statement that he wanted to represent himself; he does not claim on appeal that he really wanted new counsel.

Requests under both *Marsden* and *Faretta* must be clear and unequivocal; the one does not imply the other. (See *People* v. *Crandell*, *supra*, 46 Cal.3d at pp. 854-855; *People* v. *Williams*, *supra*, 220 Cal.App.3d at p. 1170.) Defendant's request to counsel that he be given all the papers connected with the trial also supports the conclusion that this was, in fact, a *Faretta* request. (Under either case, of course, the trial court has a similar duty to inquire into the defendant's reasons.) We therefore do not decide whether an erroneous refusal to consider a *Marsden* motion in the circumstances presented by this case would be reviewable under the "harmless error" standard.

[8] We do recognize that defendant's failure to explain himself cannot be stretched too far against him, because the court gave him little opportunity to go into details. However, defendant had later chances to talk to his attorney and demand that counsel seek to have him relieved of the consequences of any alleged incompetence—e.g., by a motion for new trial. Had defendant asked that a new trial motion be made on the grounds of incompetence, the attorney would have been obliged to notify the court and ask that new counsel be appointed to evaluate the claim. (See *People* v. *Stewart* (1985) 171 Cal.App.3d 388, 396-397 [217 Cal.Rptr. 306].) In a case where defendant's efforts to assert his rights before the court were neither firm nor explicit, the absence of any later complaints that trial representation was inadequate may be given some weight. The record does reflect that defendant consulted his counsel, before the sentencing hearing, about obtaining a stay of execution. Communication was therefore still open.

L.Ed.2d at p. 581].) The analysis is therefore necessarily different from that used in evaluating *Marsden* error, in which case it must generally be presumed that a new lawyer would have provided better representation than the challenged attorney. The United States Supreme Court has also pointed out that the "core" of the *Faretta* right is the right "to preserve actual control over the case he [defendant] presents *to the jury.*" (*McKaskel* v. *Wiggins* (1989) 465 U.S. 168, 178 [79 L.Ed.2d 122, 133, 104 S.Ct. 944], italics added.) Recognition of this point led the court to find no prejudicial error when standby counsel presents arguments to the court, outside the presence of the jury, over the defendant's objections.

Here, the case proceeded to a court trial of the prior conviction allegation. The record indicates that a "969b" packet was introduced into evidence, bearing defendant's name (as well as at least one alias) and photograph. A fingerprint expert testified that the prisoner's fingerprints in the packet belonged to defendant. The expert was cross-examined on the number of points of similarity between the prints; however, there were numerous similarities, to a level of scientific significance, and no dissimilarities were observed by the expert. No other defense was presented and none is visible from the record. It is not conceivable that defendant, representing himself, could have achieved a more favorable result.

The same is true of the sentencing hearing. Defendant, of course, had the opportunity to present his side of the story and his reasons for lenience to the probation officer, and he did so. He also wrote a letter to the court protesting his innocence, and asking for mercy because he was suffering from stomach cancer and other serious ailments. Counsel's argument also reminded the court that the five-year enhancement penalty alone ensured that defendant would be severely punished, and asked for the lower term on the robbery. The court found that the circumstances amply justified the *upper* term; the probation report listed five factors in aggravation and only one in mitigation.[9]

Nevertheless, the court imposed only the middle term. Once again, it cannot be argued that defendant might have obtained a better result on his own; the lower term simply was not a genuine possibility. Furthermore, defendant did have the personal opportunity to set out reasons for leniency, and took advantage of those opportunities. Any interference with his right of

---

[9]In aggravation, the report noted the factors of planning and premeditation (shown by luring the victim into a secluded area), defendant's numerous prior convictions (including drug offenses, three robberies, and other theft-related crimes), the fact that he was on probation at the time the crime was committed, the fact that he had previously performed poorly on probation, and the fact that he had served previous prison terms. In mitigation, the probation report listed only his poor health.

self-representation at this stage was not substantial and not prejudicial. As noted in *McKaskle*, the primary point of self-representation is to permit the defendant to present himself personally to the jury; this right was not impacted in proceedings before the court.

As in *Crandell* and *Chavez*, there simply is no reasonable probability—or even possibility—that defendant would have obtained a more favorable result acting for himself. Any error was clearly harmless.[10]

## DISPOSITION

Accordingly, the judgment is affirmed in its entirety.

Ramirez, P. J., and Hollenhorst, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 17, 1994.

---

[10]The defendant has been found guilty and sentence enhancements have been found true and he has not raised as an issue on appeal the unconstitutionality of the definition of "reasonable doubt" in CALJIC No. 2.90 and/or error by the trier of fact in its application of the "reasonable doubt" standard, as so defined.

This court deems defendant to have contended: (1) that the definition of reasonable doubt, as set forth in the CALJIC No. 2.90 jury instruction, is unconstitutional pursuant to *Cage* v. *Louisiana* (1990) 498 U.S. 39, 40-41 [112 L.Ed.2d 339, 342, 111 S.Ct. 328, 329-330], and see *People* v. *Sandoval* (1992) 4 Cal.4th 155, 185-186 [14 Cal.Rptr.2d 342, 841 P.2d 862], certiorari granted September 28, 1993, __ U.S. __ [125 L.Ed.2d 789, 114 S.Ct. 40] (Dock. No. 92-9049] and (2) that his conviction [and/or true findings] must be reversed because the trier of fact, in applying the law stated in that instruction, used an unconstitutional standard for determining guilt or innocence. (*Sullivan* v. *Louisiana* (1993) 508 U.S. __, __ [124 L.Ed.2d 182, 190-191, 113 S.Ct. 2078], citing *Arizona* v. *Fulminante* (1991) 499 U.S. 279 [113 L.Ed.2d 302, 331, 111 S.Ct. 1246].)

This court further deems the People to have opposed this contention on the ground that under the principles of stare decisis (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), this court is bound by prior decisions of the California Supreme Court upholding the constitutionality of the definition of reasonable doubt as provided in CALJIC No. 2.90, which decisions rejected constitutional challenges based upon *Cage* v. *Louisiana*, *supra*, see *People* v. *Sandoval*, *supra*.

We agree that we are bound to follow the decisions of our state Supreme Court in *People* v. *Noguera* (1992) 4 Cal.4th 599, 633-634 [15 Cal.Rptr.2d 400, 842 P.2d 1160]; *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1235 [14 Cal.Rptr.2d 702, 842 P.2d 1], and *People* v. *Jennings* (1962) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009], and thus hold that the definition of reasonable doubt as stated in CALJIC No. 2.90 is constitutional. (*People* v. *Van Fossan* (1993) 19 Cal.App.4th 1680 [24 Cal.Rptr.2d 266].)