Filed 1/20/15  P. v. Green CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B250626 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA315768) |
| v. | |
| DAVID ANTHONY GREEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

David Anthony Green appeals from a judgment and sentence, following his convictions for two murders and possession of a firearm by a felon. He contends the jury's findings of first-degree murder should be reversed, as there was insufficient evidence to support the prosecution's theory that the murders were committed while lying in wait. He further contends he was denied his right to self-representation when the trial court denied his *Faretta*[1] motion following the jury's verdict. For the reasons stated below, we find no reversible error and, accordingly, affirm.

## PROCEDURAL HISTORY

In an information, the Los Angeles County District Attorney charged appellant with two counts of first degree murder with a multiple murder special circumstance (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(3)),[2] and one count of possession of a firearm by a felon (§ 12021, subd. (a)(1)). It was alleged that in both murders, appellant personally used and intentionally discharged a firearm that caused great bodily injury and death. (§ 12022.53, subds. (b)-(d).) The information further alleged that appellant had two prior "strike" convictions within the meaning of sections 1170.12, subdivisions (a) through (d), and 667, subdivisions (b) through (i). The prosecution initially sought the death penalty, but decided before trial not to pursue it. Appellant pleaded not guilty and denied the special allegations.

---

[1] *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[2] All further statutory citations are to the Penal Code, unless otherwise stated.

A jury found appellant guilty on all counts, found the murders to be in the first degree, and found all the firearm and special circumstance allegations to be true. In a bifurcated proceeding, the trial court found the prior conviction allegations to be true.

The trial court sentenced appellant to two life-without-parole terms, plus 50 years to life on the enhancements. Appellant timely filed a notice of appeal.

**FACTUAL BACKGROUND**

On December 6, 2002, at around 2:00 a.m., Darrell Saucier was driving on Crenshaw Boulevard when he observed a Ford Taurus veer off the road and crash into a tree. Saucier turned around, drove toward the crash site, exited his vehicle and approached the Taurus. The driver -- Damon Daniels -- was slumped over the wheel, and the passenger -- Elijah Chislom -- was slumped in the driver's lap. Saucier called 911 on his cellphone and tried, without success, to open the front doors of the Taurus. He was able to open the right rear passenger door, but did not enter because there was "blood everywhere" and he did not want to get any blood on himself. While he was on the phone with the 911 operator, a passerby drove up to the scene, looked inside the Taurus, and told Saucier, "Don't touch those guys because they are dead." The passerby pointed out the bullet holes to Saucier. Saucier stayed at the crime scene until the paramedics and police arrived minutes later.

City of Los Angeles police detectives James Yoshida and Frank Weber arrived at the scene around 5:00 a.m. They observed that the driver's seat of the Taurus was moved back as far as possible, leaving very little room between the driver's seat and the rear passenger seat. The right front passenger headrest was bent forward. The exterior showed no evidence of bullet strikes, but there were

3

several bullet holes in the vehicle's interior, including in the dashboard and the interior ceiling of the car. Additionally, a bullet had pierced the airbag after it had deployed. Three .45-caliber shell casings from the same manufacturer were found in the right rear passenger compartment, and a fourth casing (along with more blood) was found at a nearby phone booth.

There were numerous blood stains and spatters on the victims' clothes and the interior of the car. The detectives observed a number of red stains resembling blood on the interior and exterior of the vehicle. In addition, there were drops of blood on the ground just outside the car. Blood swabs were taken from the interior and exterior of the car, the ground near the car, and from the sidewalk at the intersection of the crash. DNA testing matched all the blood samples that produced DNA data with the DNA profiles for Daniels and Chislom.

A police expert in fingerprint analysis identified a palm print found on the outside of the driver's window as appellant's.

A deputy coroner testified that Daniels was killed by three gunshot wounds to the back of his head and neck. Chislom was killed by a single, close-range gunshot wound to the back of his neck. The wounds were consistent with being shot by someone who was sitting in the back seat. Based on the damage to the front passenger seat and headrest, an accident reconstruction expert opined that someone had been sitting in the right rear passenger seat during the crash. No evidence indicated that anyone had been sitting in the left rear passenger seat. A criminalist testified that the pattern of blood evidence indicated that the shooter could not have been seated directly behind the driver. The criminalist opined that the shooter was in the right rear passenger seat, was splattered with blood from the victims, and then deposited that blood outside the car when exiting.

4

Daniels was 6'4". His mother, Jeanetta Price, testified he was so tall that when he drove the Taurus, he had to push the driver's seat all the way back, making it impossible for anyone to sit behind him. Price also testified that she sat in the rear passenger seat of the Taurus less than a week before the shootings and observed no damage to the passenger seat headrest. The night Daniels died, he had told Price he was going out with appellant. The other victim, Chislom, also was a friend of Daniels's. Detective Yoshida testified that the day after the murders, two of appellant's aunts and one of his cousins came to the police station and asked whether appellant had been one of the victims in the Taurus.

Three months after the shootings, on March 19, 2003, appellant was admitted to the hospital with multiple gunshot wounds. Detectives Weber and Parra spoke to appellant at the hospital on March 24, 2003, and interviewed him about the December 6th shootings of Daniels and Chislom. Appellant said he knew about the shootings and indicated the incident was connected to his own shooting. However, he said he did not want to talk further without the presence of Bobby Neal, whom he identified as his attorney.

Detectives Weber and Evans returned to the hospital to interview appellant on March 26, 2003. Although no attorney was present, appellant agreed to discuss the December 6th shooting, but did not want to identify the shooter. Appellant said he was with Daniels and Chislom on December 6th. According to appellant, the three men had attended a party together. After leaving the party, they drove to the intersection of Crenshaw and Washington where a dark SUV was waiting. Someone from the SUV got into Daniels's car. The person started yelling that appellant had been delivered to him by Daniels and Chislom in exchange for $5,000. As the person "pistol-whipp[ed]" appellant, Daniels began driving. Shortly thereafter, the assailant shot Daniels and Chislom. The assailant and

5

appellant continued fighting, the car crashed, and appellant was able to exit out the right side rear door and flee to an alley.

The detectives re-interviewed appellant later that day, this time with Neal present. Neal was not an attorney, but had some paralegal training. In this interview, which was recorded and played for the jury, appellant provided another version of the December 6th shootings.

Appellant said he had driven with Daniels and Chislom to a club that night. The two men had quizzed him about his uncle, who was a known prison snitch. Appellant thought it was suspicious, as they had never asked him about his uncle before. After they left the club, the men drove appellant to Crenshaw and Washington, where Floyd Anderson got out of a nearby car and into the back seat of the Taurus. Daniels was driving, appellant was sitting behind him, Chislom was in the front passenger seat, and Anderson was seated behind Chislom. Floyd started disparaging appellant's uncle, and said he had paid Daniels and Chislom to deliver appellant to him. Anderson pulled out a gun and pistol-whipped appellant. Anderson then shot Daniels and Chislom, firing about three times. Anderson also shot once at appellant but missed. As appellant and Anderson fought and struggled over the gun, the car crashed. Anderson exited the vehicle, and appellant followed him and ran away. Appellant was not wearing his seatbelt and suffered injuries, although not seriously enough to seek medical attention. Appellant suspected that the reason behind the incident was his uncle's snitching and that Anderson wanted him to "give up" his aunt. Appellant also suspected that Anderson was the person who shot him on March 19, 2003.[3]

---

[3] As noted, appellant's palm print was recovered from a window of the car. No latent prints were matched to Anderson.

**DISCUSSION**

Appellant was convicted of the first degree murder of Daniels and Chislom. He contends the finding that the murders were in the first degree should be reversed, as there was insufficient evidence to support one of the prosecutor's theories of first degree murder. He further contends the convictions should be reversed because he was denied his right to represent himself following the jury's verdict.

A. *Sufficiency of the Evidence on Theory of Murder by Lying in Wait*

At trial, the prosecution presented two theories of first-degree murder: (1) murder by lying in wait; and (2) willful, deliberate and premeditated murder. The trial court instructed the jury on both theories. The jury found the murders of Daniels and Chislom to be in the first degree. Appellant concedes the evidence was sufficient to support the finding that the murders were committed with willfulness, deliberation and premeditation. However, he contends the jury's findings on the degree of the murders should be reversed, as there was insufficient evidence to support a finding that the murder was committed by lying in wait. We disagree.

A jury is not required to unanimously decide on the specific theory of murder upon which it bases its guilty verdict. (*Schad v. Arizona* (1991) 501 U.S. 624, 636.) As the California Supreme Court has stated, "Because lying in wait and deliberate and premeditated theories of murder are simply different means of committing the same crime, juror unanimity as to the theory underlying its guilty verdict is not required." (*People v. Russell* (2010) 50 Cal.4th 1228, 1257.) Where a jury is presented with alternative theories regarding the commission of a crime, a reviewing court will reverse the verdict only if one of the prosecutor's alternative

7

theories is legally incorrect. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1126-1129.) "[T]his rule 'is perhaps most commonly invoked when the alternate theory is legally erroneous,' that is, when one of the theories is infected by prejudicial error such as inadmissible evidence or incorrect instructions. [Citation.]" (*Id*. at p. 1122.) However, "reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Id*. at p. 1129.)

Here, the prosecutor presented alternative theories of first degree murder. During closing, the prosecutor argued the trial evidence supported both theories of first degree murder. She stated, "I don't really think it's in dispute that this is a first-degree murder because the killing was willful, deliberate, and premeditated. The killer waited until Mr. Daniels and Mr. Chislom were vulnerable when they're sitting in a car with their backs to him, unaware they were about to get killed. He didn't -- the shooter didn't just kill them while they were getting in the car or walking up. He waited until they were in the car and the car is driving. And that took trouble and that took thought. And it also takes a certain amount of intent and thought in the head of a shooter to pull out a gun, put it to someone's head, and pull the trigger. And that's exactly what was done to Mr. Daniels and Mr. Chislom." The prosecutor further argued: "I don't think it's either in dispute that this murder was committed by means of lying in wait because the killer would not have been in the back of Mr. Daniels'[s] car and sitting directly behind Mr. Chislom if they had had any idea that that person was going to shoot them. Right? There was no way they would have let him in the car. Therefore, the killer must have concealed his true purpose to get them in such a vulnerable position."

The trial court instructed the jury on first degree murder under both of the prosecution's theories. The instructions detailed the requirements for a finding that

8

the murder was willful, deliberate and premeditated, or that the murder was immediately preceded by lying in wait. The court also instructed the jury that it could not find appellant guilty of first degree murder unless the jury unanimously agreed that the People proved that appellant committed first degree murder under one or both of the theories.

Appellant does not contend the jury was improperly instructed. Nor does he contend there was no legal basis to present the theory of murder by lying in wait. Rather, his sole contention for reversal of the findings of first-degree murder is that there was insufficient evidence to support the findings that the murders were committed by lying in wait. Specifically, appellant contends no evidence showed that he had a secret plan to sit directly behind Chislom in order to shoot both men. Appellant, however, concedes that "[a] verdict based upon premeditation, willfulness, and deliberateness is supported by the evidence." In light of appellant's concession that a valid ground exists to support the jury's finding that the murders were in the first degree, appellant's claim that an alternative ground was factually inadequate fails. Accordingly, we reject appellant's claim of error.

B.      *Denial of Faretta Motion Following Jury's Verdict*

Appellant contends he was improperly denied his right to self-representation when the trial court denied his *Faretta* motion following the jury's verdict. We conclude that the motion was brought mid-trial, and the denial of the motion was within the trial court's discretion.

1.      *Factual Background*

On May 31, 2013, as the jury was deliberating the charged crimes, appellant waived a jury trial for the prior conviction allegations. ~(5RT 1836-1837.)~ After

9

the jury returned the guilty verdicts and was discharged, defense counsel asked for and received a two-month continuance. When court reconvened on Tuesday, August 6, 2013, the prosecutor asked for a continuance to Friday. When the court asked appellant if that was agreeable, he said, "I want to try my Sixth Amendment *Faretta* right and go [pro] per to file a [new] trial motion." Asked if he would be ready by Friday, appellant said, "No." Appellant initially stated he would need "a month or so," but after further questioning, stated he would need "probably a couple months."

The trial court, citing *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*), noted that "there is no mandatory right to self-representation mid-trial." The court determined that the motion was a mid-trial request for self-representation, observing, "We are still in the middle of a court trial, or still pending a court trial relating to the truth or falsity of the priors that are alleged, as well as sentencing. And sentencing would go over only until Friday." The court examined each of the *Windham* factors and found, inter alia, that: (1) defense counsel's representation had been "exemplary," and that defense counsel was "one of the finest lawyers I have ever seen"; (2) appellant did not have a proclivity to substitute counsel and had not filed any *Marsden*[4] motions; (3) appellant's reasons for the request -- that he wanted to file a new trial motion based on evidence used against him and because the trial court had told the jury not to commit misconduct because of the cost of jury trials -- were not sufficient; (4) the motion was made mid-trial with a court trial pending on the priors; and (5) the request would result in disruption or delay because appellant asked for one month, then two, and was "not being candid with [the court] as [to] exactly how much time you are going to need." The court

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

concluded that "proceedings are still pending," and "the motion is untimely based on *Windham* factors, and it is denied."

2. *Analysis*

In *Faretta*, the United States Supreme Court held that under the Sixth Amendment of the United States Constitution, a defendant in a criminal case "has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." (*Faretta*, *supra*, 422 U.S. at p. 807, italics omitted.) The right to self-representation under the federal Constitution is unconditional only if invoked "within a reasonable time prior to the commencement of trial. [Citations.]  When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1365.)  This is because "[a] request for self-representation asserted for the first time after trial has commenced . . . is 'based on nonconstitutional grounds.'" (*People v. Bloom* (1989) 48 Cal.3d 1194, 1220, quoting *Windham*, *supra*, 19 Cal.3d at p. 129, fn. 6.)

When a request for self-representation is untimely, the trial court is obliged to exercise its discretion in light of certain factors identified in *Windham*.  (*People v. Marshall* (1996) 13 Cal.4th 799, 827.)  These factors include "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay that might reasonably be expected to follow the granting of such a motion." (*Windham*, *supra*, 19 Cal.3d at p. 128.) "'[A] reviewing court must give "considerable weight" to the court's exercise of discretion and must examine the total circumstances confronting the court when the decision is made.'" (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1353.)

11

Appellant contends his request for self-representation -- made after the jury verdicts on the charged crimes but prior to the court trial on the prior conviction allegations -- was timely. We find dispositive guidance to the contrary in *People v. Rivers* (1993) 20 Cal.App.4th 1040 (*Rivers*) and *People v. Givan* (1992) 4 Cal.App.4th 1107 (*Givan*). In those cases, the defendants requested self-representation after the first phase of trial on the charged offenses, but before the second phase of trial on prior conviction allegations. (*Rivers*, at p. 1047; *Givan*, at p. 1110.) The appellate courts concluded that the requests were untimely, reasoning that the bifurcated phase of trial devoted to prior conviction allegations is merely part of the trial. (*Rivers*, at p. 1048; *Givan*, at pp. 1113-1114.) We reach the same conclusion here.

Appellant's reliance on *People v. Miller* (2007) 153 Cal.App.4th 1015 (*Miller*), is misplaced. There, the defendant asserted a request for self-representation after the completion of trial, but before the sentencing proceeding. (*Id*. at p. 1018.) The appellate court held that the request was timely because it arose after the trial and well before sentencing, which constituted a "separate proceeding[] from the trial." (*Id*. at p. 1024.) Here, appellant asserted his request during the trial, which the court in *Miller* acknowledged to be an appropriate basis for regarding requests as untimely. (*Id*. at pp. 1023-1024.) Accordingly, appellant's request was untimely, and thus consigned to the trial court's discretion.

The trial court evaluated each of the *Windham* factors, and concluded that the motion should be denied. We find no abuse in the court's exercise of its discretion.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MANELLA, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.