Filed 6/6/16  P. v. Castillo CA2/2
Received for posting 6/7/16
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CESAR LUCAS CASTILLO,<br><br>  Defendant and Appellant. | B259049<br><br>(Los Angeles County<br>Super. Ct. No. BA409987)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed herein on May 11, 2016, be modified as follows:

1.  On page 5, the fourth full paragraph, beginning with the phrase "At the preliminary hearing" and ending with "charged with the offense" is deleted in its entirety.

2.  On page 7, in between the second full paragraph and the third full paragraph, the following paragraph is inserted:

> Park testified that she had been to court once before in response to a subpoena.  On that date, she saw defendant and thought he looked like the man who had robbed her.  She based her identification on the clothing defendant was wearing, as well as his hairstyle, round face, moustache and the way his body was shaped.  Park testified that she did not know that the accused would be in court that day, and no one had told her that defendant was the robber.  However, once she saw him standing with his attorney, she knew defendant was the person who had been charged with the offense. Park admitted that she did not tell the police or the district attorney about her identification at that time.

*_____

ASHMANN-GERST, Acting P. J., CHAVEZ, J., HOFFSTADT, J.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B259049 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA409987) |
| v. | |
| CESAR LUCAS CASTILLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  William N. Sterling, Judge.  Affirmed.

Eileen Manning-Villar, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

Cesar Lucas Castillo (defendant) appeals from a final judgment entered after his conviction by jury of two counts of second degree robbery (Pen. Code, § 211)[1] and related enhancements. We affirm the judgment.

## CONTENTIONS

Defendant argues that the trial court denied his right to due process of law under the Fourteenth Amendment to the United States Constitution by instructing the jury with CALCRIM No. 315, which advises jurors on how to evaluate eyewitness identifications. Defendant argues that the instruction ratifies the common misperception that a witness's certainty correlates with his or her accuracy. Because the case rested substantially on eyewitness identification, defendant argues that the error requires reversal.

Defendant further argues that the trial court erred in denying his motion to waive counsel and represent himself. Defendant argues that this error deprived him of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

## FACTUAL BACKGROUND

### The Gomez incident (count 2)

Fernando Gomez (Gomez) listed his Galaxy S3 cellular telephone for sale on Craigslist. The telephone number associated with the cellular phone was (213) 300-7221. On April 7, 2013, at 8:00 p.m., Gomez and his wife Elsita Gomez (Mrs. Gomez) drove to Immanuel Presbyterian Church in Los Angeles to meet a man interested in buying the cellular telephone. They did not see anyone, so they drove to a gas station. A short time later, a man called and indicated that he was at the church.

Gomez parked his truck at the entrance of the church's parking lot. He stepped out of the truck to meet a man, whom both Gomez and his wife identified in court as defendant. After defendant and Gomez spoke briefly about the phone, defendant pulled a silver revolver from his waistband and pointed it at Gomez's chest. Defendant demanded that Gomez give him both the Galaxy S3 and another cellular telephone that Gomez was carrying. Mrs. Gomez stepped out of the truck and told Gomez to give defendant the

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2

phones. Defendant grabbed both phones, put them in his pocket, and walked away. Gomez called the police.

**The Park incident (count 3)**

Jinyi Park (Park) had advertised her Samsung Galaxy Note 2 for sale on Craigslist. On April 8, 2013, at approximately 5:00 p.m., Park went to Jon's Market to meet a man interested in buying the cellular phone. The man had been texting Park about her phone from the number (213) 300-7221. After failing to connect at the market, the man asked Park to meet him at the parking lot across the street.

Park drove over to the parking lot and parked next to the only person she saw there. As she stepped out of her car, the man, whom Park identified as defendant in court, asked to see the phone. Park handed the phone in its box to defendant. After briefly examining the phone, defendant lifted his shirt to reveal a gun in his waistband. Defendant told Park he had a gun and instructed her to leave. Park panicked and froze, and defendant ran away with the phone. Park called the police.

**The Sanchez incident (count 4)**

On April 7, 2013, Hugo Sanchez (Sanchez) exchanged texts with an individual selling a Galaxy S3 mobile phone on Craigslist. The seller's texting number included an area code of "213" and the number "300." The parties were not able to arrange a meeting that evening.

The following day, Sanchez received texts regarding the same phone from a different number. This phone had a "708" area code. When Sanchez tried to text to the "213-300" number, he received a message that the number had been disconnected. The parties made plans to meet later that evening in the Koreatown section of Los Angeles. At about 10:50 p.m., while Sanchez waited outside the apartment building where the parties had agreed to meet, a Hispanic man in his late 20's approached him. The man was 5'8" or 5'9", weighed between 160 and 170 pounds, had a shaved head, and wore a black hoodie with blue jeans.

Sanchez asked the man if he was selling a phone. The man said that he was and handed Sanchez a white Galaxy S3. When Sanchez asked if the man had paid the bill,

3

the man said "all right, give me the money." The man raised the bottom of his hoodie and pulled a gun out of the waistband of his pants, showing it to Sanchez. The man proceeded to pat down the pockets of Sanchez's clothing, taking his wallet and keys. After throwing the keys into the street, the man ran off with Sanchez's wallet and cash.

**Investigation**

On April 9, 2013, at approximately 5:00 p.m., Los Angeles Police Detectives Webster Wong, Thomas Penson, and Ron Kim went to the apartment of defendant's girlfriend, Blanca Ponce. Detective Penson detained defendant in front of the apartment and recovered a Nokia cellular telephone from defendant's pants pocket. During a search of Ponce's apartment, officers recovered a box for a Samsung Galaxy Note 2 containing international adaptors. Defendant was arrested.

Detective Wong returned the Nokia phone to Mrs. Gomez, who identified the phone as belonging to her husband. Mrs. Gomez was able to unlock the phone and indicated that the email address located in the phone belonged to her. Mrs. Gomez identified defendant from a six-pack photographic lineup. She circled defendant's photograph and wrote: "This guy looks like the one from last night" and then wrote "But I'm not sure." Gomez was not able to identify defendant in a six-pack photographic lineup.

Detective Wong showed the box for the Samsung Galaxy Note 2 to Park. Park identified the item as hers because her box contained international adaptors. Park was unable to identify defendant in a six-pack photographic lineup. She indicated that defendant was not among the pictures.

## PROCEDURAL HISTORY

Defendant was charged with four counts of second degree robbery (§ 211). It was further alleged as to all counts that he personally used a dangerous and deadly weapon (§ 12022, subd. (b)(1)), and personally used a firearm (§ 12022.53, subd. (b)). In addition, it was alleged as to all counts that defendant suffered three prior prison terms (§ 667.5, subd. (b)). Defendant pleaded not guilty and denied the special allegations.

4

**Preliminary hearing**

At the preliminary hearing, Mrs. Gomez identified defendant as the man who robbed her husband. She told the court that when she made the identification in the photographic lineup, she was not sure:

> "I wasn't sure enough if it was him, but I circle it because I don't know. Something was telling me, like, he looked like it was him. I don't know. It looked like him. I was picturing him skinnier like he looks now and with the glasses on and his little moustache that he had. Everything matched. Everything was matching."

When she identified defendant at the preliminary hearing, Mrs. Gomez said she knew it was him because "I will never forget his face" and "I remember how he looked and everything." She admitted that somebody had told her that the person who had been found with her husband's phone would be in court that day and that she would be asked to identify him.

Gomez also identified defendant as the perpetrator at the preliminary hearing. He asked "[t]he guy with the jail outfit" to stand up so that he could get a better look. Then he stated that he thought defendant was the person who robbed him. During cross-examination, Gomez stated that the suspect had been wearing a gray shirt and blue jeans, although he had told police that the shirt was yellow. The robber also had a moustache and had put on glasses at the end of the robbery. Gomez rated his certainty about his identification of defendant as eight on a scale of ten, and said he told police that he had seen defendant's photo in the six-pack lineup.

At the preliminary hearing, Park stated that defendant looked like the man who had robbed her. She based her identification on the clothing defendant was wearing, as well as his hairstyle, round face, moustache and the way his body was shaped. Park testified that she did not know that the accused would be in court that day, and no one had told her that defendant was the robber. However, once she saw him standing with his attorney, she knew defendant was the person who had been charged with the offense.

5

Sanchez did not identify defendant at the preliminary hearing. He described the man who robbed him as 5'6" or 5'7," kind of chubby, age 26 to 28 years, Hispanic, wearing a "Bruno Mars" style hat. When asked if he saw anyone at the hearing who looked like his assailant, Sanchez looked around for about 17 seconds and then stated that he did not see the person who took his wallet and cash.

**Defendant's pretrial motions**

Defendant made a motion pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) for substitution of counsel due to inadequate representation. On September 16, 2013, the motion was heard and denied.

On November 5, 2013, defendant made a motion pursuant to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) to proceed without counsel. After inquiring of defendant whether he would be ready to go to trial within the next eight days, the court found the request untimely and denied the motion.

**Trial**

Just prior to calling in prospective jurors for voir dire, the court granted the defense's motion to dismiss count 1.

Mrs. Gomez identified defendant at trial as the person who had robbed her husband. During cross-examination, she admitted the incident occurred quickly and that she focused much of her attention on the assailant's gun. She told police shortly after the incident that the robber had been wearing blue jeans and a long-sleeved gray shirt as well as some clear-lensed glasses. When prompted by defense counsel, she also recounted that she had previously described the shirt as having a picture of a tiger on it. Mrs. Gomez estimated that the robber was 5'4" or 5'5" and characterized him as "skinny" not "fat," "like 150 . . . 160."

Mrs. Gomez also told the jury that she was "positive" the person she identified in the six-pack photographic lineup was the person who committed the robbery. Yet when confronted with the uncertainty she had expressed at the photographic lineup, she maintained she had been lying then, but now was telling the truth.

Gomez also identified defendant at trial as the person who had robbed him. He admitted that he only looked quickly at defendant. When asked if he wanted to avoid looking at defendant in court, Gomez responded: "I don't want to go looking at no guy. Come on. Especially after he robbed me." Gomez also testified that when shown the six-pack photographic lineup, he identified defendant as the individual who robbed him. However, he stated: "[B]ut I didn't want no problems with the guy, you know, so I wasn't going to sign or anything like that."

Park identified defendant and confirmed that she was certain that he was the robber. She testified that although she had gotten a good look at her assailant, she could not pick him out among the six photographs shown to her a few days after the robbery. When shown the same six-pack of photographs, Park picked out defendant as the person in photo No. 3.

Sanchez testified at trial that the robber was a Hispanic man, approximately 5'8" or 5'9" tall, 160 to 170 pounds, aged 26 or 27 years old. The robber was wearing blue jeans and a black hoodie at the time of the incident. On cross-examination Sanchez admitted that at the preliminary hearing he had also described the suspect as chubby and wearing prescription glasses. When asked whether defendant was the person who robbed him, Sanchez stated, "I'm not sure. . . .  I don't think it's him."

Defendant did not testify or present any evidence.

Defendant was found guilty on counts 2 and 3 as charged. A mistrial was declared as to count 4.

**Sentencing**

The prosecution's motion to strike defendant's prior prison term allegations was granted. Defendant was sentenced to 19 years 4 months in state prison, as follows: the high term of five years on count 2 (§ 213), plus a consecutive term of 10 years for personal use of a firearm during the commission of count 2 (§ 12022.53, subd. (b)); one year (one-third the midterm of three years) on count 3 (§ 213), and three years four months for personal use of a firearm during the commission of count 3 (§ 12022.53, subd.

(b)).  All terms are to run consecutively.  The court also ordered defendant to pay various fines and fees and awarded custody credits.

**Notice of appeal**

On September 18, 2014, defendant filed a timely notice of appeal.

## DISCUSSION

### I.  Eyewitness identification instruction (CALCRIM No. 315)

The trial court instructed the jury in this case with CALCRIM No. 315, which advises jurors on how to evaluate eyewitness identifications.[2]

Defendant argues that the trial court erred by giving this instruction, since it ratified the common misperception that a witness's certainty correlates with his or her accuracy.  Specifically, defendant challenges the instruction's directive that the jury consider "how certain was the witness when he or she made an identification[?]" Defendant argues that many scientific studies have confirmed that a witness's perceived sense of certainty about his or her identification is usually not a good indicator of the identification's accuracy.

---

[2]     The instruction was read to the jury as follows:  "You have heard eyewitness testimony identifying the defendant.  As with any other witness, you must decide whether or not the witness is truthful and accurate testimony.  In evaluating identification testimony consider the following questions:  did the witness know or have contact with the defendant before the event; how well could the witness see the perpetrator; what were the circumstances affecting the witness'[s] ability to observe, such as lighting, weather conditions, obstructions, distance, and direction of observation; how closely was the witness paying attention; was the witness under stress when he or she made the observation; did the witness give a description and how does that description compare to the defendant; how much time passed between the event and the time when the witness identified the defendant; was the witness asked to pick the perpetrator out of a group; did the witness ever fail to identify the defendant; did the witness ever change his or her mind about the identification; how certain was the witness when he or she made an identification; are the witness and defendant of different races; were there any other circumstances affecting the witness'[s] ability to make an accurate identification.  The People have a burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met their burden, you must find the defendant not guilty."

8

### A. Standard of review

An appellate court reviews instructional error such as this independently, since the underlying question is one of law. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217.)

### B. Applicable law

In *People v. Ward* (2005) 36 Cal.4th 186 (*Ward*), the California Supreme Court considered whether the trial court erroneously included a "level of certainty" factor in the standard eyewitness instruction in use at the time, CALJIC No. 2.92. The instruction directed the jury to consider "'the believability of the eye witness as well as other factors which bear upon the accuracy of the witness' identification,'" including the "'extent to which the witness is either certain or uncertain of the identification.'" (*Ward, supra*, at p. 213.) The high court noted that the defendant did not request his proposed modifications at trial, and there was no sua sponte duty on the part of the trial court to modify the instruction. Numerous witnesses had indentified the defendant; the defendant's expert testified that there was no correlation between an eyewitness's level of certainty and the accuracy of his or her identification; and the defendant strongly attacked the accuracy of the eyewitness identifications at trial. (*Id.* at pp. 213-214.)

Similarly, in *People v. Sullivan* (2007) 151 Cal.App.4th 524 (*Sullivan*), the defendant argued that the trial court failed to delete sua sponte the reference to witness "'certainty'" from CALJIC No. 2.92 regarding the factors to be considered in determining the weight to be given eyewitness testimony. (*Sullivan, supra*, at p. 561.) The Court of Appeal determined that the trial court had no such duty to modify a jury instruction on its own motion. Further, the court cited *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1303, disapproved on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434, 452, and *People v. Wright* (1988) 45 Cal.3d 1126, which expressly approved CALJIC No. 2.92. As was done in *Gaglione* and *Wright*, the *Sullivan* court rejected the defendant's arguments that CALJIC No. 2.92 was improper as given with reference to degree of certainty as a factor in assessing the reliability of eyewitness identification testimony. (*Sullivan, supra*, at p. 562.)

Finally, in *People v. Johnson* (1992) 3 Cal.4th 1183 (*Johnson*), the defendant argued that the trial court erred in instructing the jury "that the extent to which the witness was either certain or uncertain of the identification was a factor to consider in assessing eyewitness testimony." (*Id.* at p. 1231.) In *Johnson*, an expert witness had testified without contradiction that a witness's confidence in an identification does not positively correlate with its accuracy. In addition, because the instruction directly contradicted the expert's testimony, it implied that the jury could not rely on her evidence. (*Ibid.*) The high court rejected these arguments, noting that the jury was not required to accept the expert's testimony, yet it was permitted to find that the eyewitness identification was not necessarily an accurate one. (*Id.* at p. 1232.)

### C. *Scientific studies and foreign authority*

Defendant urges this court to find that *Johnson* and *Ward* are not controlling precedent. Defendant notes that *Johnson* was decided 23 years ago, and that the high court merely held that the instruction, which contained the same certainty factor at issue here, would not confuse the jury under the circumstances of that case. As to *Ward*, defendant notes that the issue was one of dozens in the capital appeal, and the Supreme Court devoted only three paragraphs to the subject. In addition, defendant states, updated scientific research and out-of-state authority provide cause for reconsideration of the issue.

Defendant argues that recent scientific studies have revealed that an eyewitness's confidence or certainty, in most cases, has little to do with his or her accuracy (citing Wells & Olson, *Eyewitness Testimony* (2003) 54 Annu. Rev. Psychol. 277, 283-284). In addition, a witness's confidence can be bolstered by suggestive procedures or confirming feedback. (Citing Wells & Bradfield, *"Good, you identified the suspect": Feedback to Eyewitnesses Distorts their Reports of the Witnessing Experience* (1998) 83 J. Appl. Psychol. 360, 366-368, 372-373.) Witness confidence is the single most influential factor in a juror's determination of whether an identification is accurate (citing Wells et al., *Accuracy, Confidence, and Juror Perceptions in Eyewitness Identification* (1979) 64 J. Appl. Psychol. 440, 446). However, jurors are often unaware of how easily witness

confidence can be manipulated. (Benton et al., *Eyewitness Memory is Still Not Common Sense: Comparing Jurors, Judges and Law Enforcement to Eyewitness Experts* (2006) 20 Appl. Cognit. Psychol. 115, 119-120.)[3]

Defendant argues that in light of these studies, California precedent on eyewitness identification is dangerously outdated. Defendant points to Justice Sotomayor's dissent in *Perry v. New Hampshire* (2012) ___ U.S. ___ [132 S.Ct. 716], explaining that "The empirical evidence demonstrates that eyewitness misidentification is '"the single greatest cause of wrongful convictions in this country."'. . . Study after study demonstrates that . . . jurors routinely overestimate the accuracy of eyewitness identifications; [and] that jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy." (*Id*. at pp. 738-739, dis. opn. of Sotomayor, J., fns. omitted.)[4]

Thus, defendant argues, where, as here, the conviction rested on one or two eyewitness identifications, the erroneous instruction violates due process.

---

[3]     Contrary to defendant's pronouncement that these articles discuss "recent" scientific research, we note that with the exception of the Benton article, all of these articles were published well before the Supreme Court's decision in *Ward.*

[4]     In *Perry*, the majority rejected the defendant's argument that due process requires a trial judge to conduct a preliminary assessment of the reliability of eyewitness identifications. Defendant notes that despite the high court's failure to act, several states have fashioned safeguards against convictions resting on unreliable identifications. (See *State v. Lawson* (Or. 2012) 291 P.3d 673 [Oregon Supreme Court introduced new procedures for determining the admissibility of eyewitness identification evidence in light of recent research on the dangers of misidentification, reversing a conviction for new trial where the identification procedures were overly suggestive]; *Brodes v. State* (Ga. 2005) 614 S.E.2d 766 [Georgia Supreme Court determined that including a "level of certainty" instruction on reliability of eyewitness identification was harmful error in the matter before it]; *State v. Henderson* (N.J. 2011) 27 A.3d 872 [Supreme Court of New Jersey determined that test for evaluating the trustworthiness of eyewitness evaluations should be revised in light of scientific research; proposing pretrial hearings regarding admissibility where defendant can show some evidence of suggestive procedures and enhanced jury instructions describing the relevant facts for eyewitness identifications and their effect on reliability].)

## D. Forfeiture

We first address the People's threshold argument that defendant has forfeited this claim because he failed to object to CALCRIM No. 315 at trial. (See *Ward, supra*, 36 Cal.4th at p. 213 [trial court has no sua sponte duty to modify instruction to delete factor concerning level of certainty]; *Sullivan, supra*, 151 Cal.App.4th at p. 561 [same].)

Defendant responds to this argument by quoting section 1259, which provides that "[t]he appellate court may . . . review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Thus, defendant argues, his failure to object to the instruction does not preclude review for constitutional error. (*People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.)

Defendant asserts that the instructional error violated his Fourteenth Amendment right to due process of law and thus affected his "substantial rights" under section 1259. Accordingly, we review defendant's claim on the merits.

## E. No error occurred

*Ward* remains the law of this state. In *Ward*, that defendant made similar arguments to those made here. He argued that the trial court erroneously included a "level of certainty" factor in its eyewitness instruction, which was standard in the predecessor instruction to CALCRIM No. 315, as it is in the current instruction. The defendant in *Ward* also argued that the inclusion of the certainty language in the instruction deprived him of his Fourteenth Amendment right to due process of law. Defendant makes the same argument here.

The Supreme Court of this state disagreed with this argument, finding that the trial court had no sua sponte duty to modify the instruction to delete the "'level of certainty' factor." (*Ward, supra*, 36 Cal.4th at p. 213; see also *Johnson, supra*, 3 Cal.4th at p. 1232 [finding that the trial court did not err in instructing the jury that it may consider witness certainty in assessing eyewitness testimony].) In addition, the high court found that any potential error was harmless in that case because numerous witnesses identified the defendant as the perpetrator; defendant's expert testified that there was no correlation

12

between an eyewitness's level of certainty and the accuracy of his or her identification; and defendant strongly attacked the accuracy of the eyewitness identifications at trial. (*Ward*, at p. 214.)

The trial court did not err in instructing the jury with the standard language of CALCRIM No. 3.15, which, despite challenges to the predecessor instruction, has not been declared unconstitutional in this state.

### F. Any error was harmless in this case

Instructional error is reversible only if "'the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error.' [Citation.]" (*People v. Wright, supra*, 45 Cal.3d at p. 1144, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) We find that even if the language of the instruction were erroneous, any instructional error would be harmless in this case.[5]

First, as in *Ward*, several witnesses identified defendant, including Gomez, his wife, and Park. Mrs. Gomez had identified defendant previously in a photographic lineup. In addition, the record shows that witnesses were cross-examined regarding their eyewitness identifications. Defendant's counsel got Mrs. Gomez to admit that she had been focused on the gun during the robbery and that the perpetrator turned and quickly walked away. In addition, defendant's counsel pointed out that Mrs. Gomez indicated uncertainty that defendant was the perpetrator when she picked his photograph out of the six-pack.

The problems with Gomez's identification were also brought out for the jury's consideration. Defendant's counsel questioned Gomez on his very brief glance at the robber and the fact that he did not pick defendant's photo when shown a six-pack. Park

---

[5] Defendant argues that because the alleged error raised here implicates his federal constitutional right to due process of law, this court must review this claim under the federal standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24. Under that standard, the question is whether the court can declare the error harmless beyond a reasonable doubt. (*Ibid*.) We find the error harmless under both the state and federal standards.

was also cross-examined about her failure to identify defendant in a six-pack shown to her just a few days after the robbery. Defendant's attacks on the accuracy of the eyewitness identifications allowed the jury to consider that the witnesses may not have always been so certain that the defendant was the perpetrator. Indeed, the neutral wording of the instruction, which directs the jurors to consider "how certain was the witness when he or she made an identification," allows the jury to consider the witness's prior failures to identify him and, in the case of Mrs. Gomez, her clear articulation of uncertainty.

The error was also harmless because the identifications were corroborated by independent evidence. Gomez's cellular telephone was recovered from defendant's pocket. In addition, Park's cellular telephone box and adaptors were recovered from defendant's girlfriend's residence.

Accordingly, even if it was error for the trial court to include the certainty language in CALCRIM No. 3.15, any such error was harmless under the circumstances of this case.

## II. *Faretta* motion

On November 5, 2013, this case was called for jury trial. At the hearing, defendant moved to represent himself in pro. per. The trial court asked him if he was "prepared to go to trial within the next 10 days." Defendant replied that he would not be, because he needed to see if he could get his paperwork from his trial attorney. The court then asked the prosecution and defense to state whether each would be ready within the 10 days. The parties informed the court that they would be ready on the eighth day.[6]

At that point, the court and defendant had the following exchange:

"The Court: Okay. Of course Mr. Castillo, I will consider your request. I'll let you figure out the paperwork if you want, but unless you are prepared to be ready to go to

---

[6] At a hearing on November 13, 2013, the court continued the jury trial by stipulation until January 8, 2014. The trial was subsequently continued several times until it finally commenced on July 10, 2014. The record does not indicate that defendant ever renewed his request for self-representation when these extensions were granted.

trial within the next eight days then the court does not believe your request is timely. So do you want the paperwork and to fill out the paperwork and talk to me about being your own counsel?

"The Defendant:   Like I said, I'm going to need time to study the case. I need all the discovery and motions.

"The Court:  That's why the court doesn't believe it's timely, because you're indicating that you're not going to be ready within the next eight days. Both the People and your current counsel are going to be ready within the next eight days so and this case was arraigned back in June so it's time for it to go to trial. However, with that understanding, do you still want to fill out the paperwork and have a discussion about being your own counsel?

"The Defendant:  I'm going to have to need some more -- I might need some more time to just briefly through all the --

"The Court:  You're indicating you are not going to be ready within the next --

"The Defendant:  No, ma'am.

"The Court:  Find the request not timely. Both sides have announced ready. So let me fill out the transfer memo."

Defendant argues that the trial court erred by summarily denying his *Faretta* request. Defendant maintains that the request was timely and that the trial court erred by failing to weigh all of the relevant factors before denying the request for self-representation. Defendant further argues that this error denied him his Sixth Amendment right to represent himself, and must be reversed.

### A. Timeliness

In support of his position that the *Faretta* request was timely made, defendant cites *Ferrel v. Superior Court* (1978) 20 Cal.3d 888, abrogated on other grounds in *People v. Butler* (2009) 47 Cal.4th 814, 826. In *Ferrel*, the petitioner had, "since the initiation of the criminal proceedings against him, sought to proceed in propria persona." (*Ferrel*, at

p. 890.)  The case does not suggest that defendant's motion was timely under the circumstances of this case.**7**

In addition, defendant cites *People v. Windham* (1977) 19 Cal.3d 121, 124 (*Windham*).  In *Windham*, the defendant made a mid-trial motion to represent himself.  The trial court denied the motion "principally on the ground that it came at too late a stage of the proceedings."  (*Id.* at p. 125.)  The *Windham* court reasoned:

> "The experience of other jurisdictions in dealing with the procedural implementation of a constitutionally based right of self-representation demonstrates that the requirement of a pretrial motion to that effect is a workable and appropriate predicate to the exercise of the *Faretta* right.  We hold therefore that in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial."

(*Windham, supra*, 19 Cal.3d at pp. 127-128, fn. omitted.)

In assessing a late request to discharge an attorney and proceed in pro. per., the trial court should consider "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion."  (*Windham, supra*, 19 Cal.3d at pp. 128-129.)

The Supreme Court discussed the issue further in *People v. Lynch* (2010) 50 Cal.4th 693 (*Lynch*), abrogated on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-644.  The high court noted that it has long held "that a self-representation motion may be denied if untimely.  [Citation.]"  (*Lynch, supra*, at p. 722.)  For example, the court has "held on numerous occasions that *Faretta* motions made on the eve of trial are untimely."  (*Lynch*, at p. 722.)  In one case, a *Faretta* motion made a

---

**7**    *People v. Joseph* (1983) 34 Cal.3d 936 (*Joseph*) also does not support defendant's position in this case.  In *Joseph*, the defendant made his *Faretta* motion five months before trial and almost two months before any pretrial motions were heard.  (*Joseph, supra*, at p. 944.)  Under the circumstances of that case, the trial court's denial of the defendant's motion to represent himself was error.

month before trial was considered untimely given the surrounding circumstances of that case. In another case, a motion made six days before trial commenced was also considered untimely, where both prosecution and defense counsel were ready to proceed and there was a serious witness problem at hand. (*Lynch*, at pp. 723-724.) Thus, the high court explained, "timeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made." (*Lynch*, at p. 724.) The United States Supreme Court has also observed that "lower courts generally require a self-representation motion to be timely, a limitation that reflects that 'the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.' [Citation.]" (*Id.* at p. 722, citing *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.* (2000) 528 U.S. 152, 162.)

"'When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion.' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 959, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1365.)

Under these authorities, the trial court had the discretion to deny defendant's *Faretta* motion as untimely. The motion was made on the day the matter was called for trial, and both sides were ready to proceed on the eighth day of the trailing period. Upon being questioned by the court, defendant made it clear he would need to delay the proceedings in order to represent himself. Given the disruption and delay which would reasonably be expected to follow the granting of defendant's motion, it was well within the trial court's discretion to deny the motion as untimely.

### B. The Windham *factors*

Alternatively, defendant argues that the trial court's denial of his *Faretta* motion must be reversed because the trial court failed to make the inquiry mandated by *Windham*. In *Windham*, the Supreme Court stated:

> "Among [the] factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's

representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion."

(*Windham, supra,* 19 Cal.3d at p. 128; see also *People v. Marshall* (1996) 13 Cal.4th 799, 827 [noting that a *Faretta* motion made after a reasonable time before the commencement of trial "is addressed to the sound discretion of the trial court, which should consider" the factors listed in *Windham*].)

Defendant cites *People v. Rivers* (1993) 20 Cal.App.4th 1040, 1048 (*Rivers*) for the proposition that it is error if the trial court summarily denies a *Faretta* motion without implicitly considering the *Windham* factors. In *Rivers*, the defendant moved for self-representation after the jury had rendered its verdict but before the adjudication of the sentence enhancement allegation. Without discussion or inquiry, the court denied the motion as untimely. (*Rivers*, at p. 1047.)

The Fourth Appellate District acknowledged that the trial court properly recognized that a *Faretta* request made during trial is not timely. (*Rivers, supra*, 20 Cal.App.4th at p. 1048.) However, the court pointed out that "a defendant dissatisfied with counsel must be permitted to recount specific examples of claimed inadequacy." (*Id.* at p. 1049.) The court found that the trial court erred in denying the defendant a chance to explain his desire to represent himself. Nevertheless, ultimately the court found the error to be harmless because "there simply is no reasonable probability -- or even possibility -- that defendant would have obtained a more favorable result acting for himself." (*Id.* at p. 1053.)

The matter before us differs from *Rivers*. Here, the trial court did not deny the request "[w]ithout discussion or inquiry," as the trial court did in *Rivers*. (*Rivers, supra*, 20 Cal.App.4th at p. 1047.) Instead, after explaining to defendant that the court did not believe the request was timely, the court invited defendant to "fill out the paperwork and talk to me about being your own counsel." Defendant then stated that he needed to "study the case," including getting all the discovery from his counsel. The court again

18

indicated that trial needed to go forward, but then, a second time, invited the defendant to "fill out the paperwork and have a discussion" about being his own counsel. When defendant repeated that he would need additional time, the court found the request untimely.

While the court offered defendant the opportunity to discuss his reasons for seeking to proceed in pro. per., defendant made no effort to do so. Instead, he repeatedly indicated that he needed more time. Unlike the situation in *Rivers*, this was not a summary denial devoid of discussion.

A subsequent conversation with counsel indicated that there were 13 witnesses, approximately 20 exhibits, and separate victims involved in the impending trial. Thus, the trial court did not err in implicitly determining that due to the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of defendant's motion, his *Faretta* motion was untimely.

Here, the court set forth its rationale, explored the effects of delay, and offered defendant the opportunity to discuss his motion for self-representation. We find no abuse of discretion in the court's decision to deny the motion.[8]

Nor do we find error in the trial court's failure to explicitly consider each factor set forth in *Windham*. No case mandates that the trial court explicitly discuss each of the *Windham* factors. In fact, the *Windham* court declined to "mandate a rule that a trial court must, in all cases, state the reasons underlying a decision to deny a motion for self-representation." (*Windham, supra*, 19 Cal.3d at p. 129, fn. 6.) Instead, the high court only required that there be "a sufficient record on appeal in such cases in order to sufficiently evaluate alleged abuses of discretion when motions for self-representation are denied." (*Ibid.*)

---

[8] Again, we note that the matter was subsequently delayed by stipulation for several months. If defendant were truly intent on representing himself, this delay would have provided him an opportunity to renew his motion and have the time he claimed he needed to prepare himself. There is no evidence that defendant ever renewed his request.

19

The trial court's exercise of discretion must be upheld where there are sufficient reasons on the record to support an implicit consideration of the *Windham* factors. (*People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354-1355.) Here, defendant was given the opportunity to inform the court of his reasons for his request. The trial court implicitly considered defendant's failure to provide such reasons, despite the court's invitation.[9] The trial court explicitly considered defendant's repeated requests for more time. This provides us with a sufficient record to evaluate the court's decision. We find no error.

In addition, as in *Rivers*, any error would be harmless under the circumstances of this case. Of four counts initially alleged against defendant, count 1 was dismissed and the jury hung on count 4. Thus, defendant's counsel was able to assist defendant in avoiding conviction on two of the four counts. As to the remaining two counts, the evidence against defendant was overwhelming. He was identified by the two victims and a witness as the perpetrator of the robberies. Those identifications were corroborated by independent evidence, such as the recovery of stolen property from defendant's pocket and his girlfriend's residence, and the use of the phone number in the Gomez robbery in the subsequent robberies. Under the circumstances, we find there is no reasonable probability that defendant would have obtained a more favorable result in acting for himself. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Any error was therefore harmless.

---

[9] Defendant emphasizes his previous *Marsden* motion, arguing that this prior motion weighed in favor of his *Faretta* motion by showing displeasure with his counsel's representation. However, as the respondent points out, the motion was resolved against defendant, thus giving the trial court assurance that defense counsel's representation had been found to be adequate.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT


21